# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| KPH HEALTHCARE SERVICES, INC. A/K/A KINNEY DRUGS, INC., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BAUSCH HEALTH COMPANIES INC., BAUSCH HEALTH IRELAND LTD., SALIX PHARMACEUTICALS, LTD., SALIX PHARMACEUTICALS, INC., TEVA PHARMACEUTICAL INDUSTRIES LTD., TEVA PHARMACEUTICALS USA, INC., and ACTAVIS LABORATORIES FL, INC.,<br><br>Defendants. | Civil Action No.  1:25-cv-544 |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc., ("KPH" or "Plaintiff") on behalf of itself and all others similarly situated, brings this lawsuit against Bausch Health Companies, Inc., Bausch Health Ireland Ltd., Salix Pharmaceuticals, Ltd., Salix Pharmaceuticals, Inc. (collectively "Bausch"), Teva Pharmaceutical Industries Ltd., Teva Pharmaceuticals USA, Inc., and Actavis Laboratories FL, Inc. (collectively "Teva") (Bausch and Teva together "Defendants").

## I.     INTRODUCTION

1.     Plaintiff brings claims against Defendants for anticompetitive conduct in the market for Xifaxan® (rifaximin) ("Xifaxan") in violation of Sections 1 and of the Sherman Act, 15 U.S.C. §§ 1, 2. Further, this case involves an unlawful agreement among the Defendants to

restrain competition for Xifaxan and its generic equivalents and Bausch's monopolization of the market, enabling it to charge supracompetitive prices.

2.      The active ingredient of Xifaxan, rifaximin, is a broad-spectrum antibiotic used since 1987 for treating various gastrointestinal ailments. The compound of rifaximin was patented in 1982.

3.      Bausch markets Xifaxan 550 mg, the only rifaximin product available on the market to treat Irritable Bowel Syndrome with Diarrhea ("IBS-D"). Xifaxan is also indicated for the treatment of overt hepatic encephalopathy ("HE") recurrence in adults and for travelers' diarrhea in children in a 200 mg dosage. In 2024, Bausch's annual sales of Xifaxan in the U.S. were approximately $1.99 billion, and nearly all were sales of the 550mg dosage. Bausch currently charges more than $2,000 for a 14-day regimen of Xifaxan.

4.      The price of Xifaxan is so high because Bausch exploited a weak patent portfolio and filed patent infringement suits against potential generic manufacturers to prevent competition that would have resulted in lower prices. Bausch's patent portfolio is weak, because the 1982 patent covering the active ingredient of Xifaxan expired long ago, and Bausch relies on secondary patents that are narrow in scope. These secondary patents, or follow-on patents, claim specific polymorphic forms or methods of treating disease. Bausch's secondary patents have been invalidated by federal courts as described herein.

5.      When Teva's predecessor developed a generic Xifaxan product and filed the first Abbreviated New Drug Application ("ANDA") seeking approval to launch a competing generic product, Bausch sued for patent infringement. Bausch and Teva later entered an unlawful reverse payment agreement to settle the patent infringement suit and allocate the market. Bausch agreed to pay Teva to delay entering the market with 550 mg generic Xifaxan, and Teva agreed to drop

its ANDA litigation and patent challenge and to stay out of the market from September 2018 until as late as January 2028.

6.    Bausch also agreed not to compete with a future Teva generic product by not launching its own unbranded product, otherwise known as an authorized generic ("AG").

7.    As described herein, Bausch's payment to Teva was worth more than $300 million to Teva.

8.    Bausch and Teva also included additional anticompetitive provisions in their settlement as a means of deterring other generic manufacturers from entering the market. For example, if another generic manufacturer were to enter the market before January 2028, Bausch agreed to let Teva do the same. This deterrence clause reduced other generic manufacturers' incentive to challenge Bausch's patents. At least two other generic manufacturers, Sun Pharmaceutical Industries Ltd. ("Sun") and Sandoz, Inc. ("Sandoz"), agreed to drop their patent challenges and stay out of the market until after the delayed January 2028 date for Teva's generic launch.

9.    The weakness of Bausch's patents is supported by another generic manufacturer's prevailing against Bausch and invalidating Bausch's patents. Norwich Pharmaceuticals, Inc. ("Norwich"), litigated Bausch's principal patents and obtained a federal court decision that Bausch's IBS-D patents were invalid, which was upheld by a court of appeals. However, Norwich erred in not carving out certain HE-related uses of Xifaxan from its labeling. For that reason, Norwich cannot enter the market before Teva and until the non-IBS-D patents expire in 2029, even though the IBS-D and polymorph patents have been found invalid and unenforceable.

10.    Because of Defendants' unlawful agreement, generic competition likely will not occur until Teva enters the market in January 2028. Teva then has 180-day ANDA exclusivity

that effectively blocks subsequent filers—other generic manufacturers—from entering the market until Teva enjoys the benefit of its 180-day exclusivity.  In addition, Bausch has received additional patents and listed those patents in the FDA's Orange Book, providing it with automatic 30-month stays of competition from other generic manufacturers that recently filed applications with the FDA seeking to market generic Xifaxan 550 mg.  Bausch listed those patents despite the fact that, under the Hatch-Waxman statute and controlling regulations, they could not lawfully be listed. The later-filing generics are now blocked from entering the market, due to the 30-month stay and Teva's 180-day exclusivity.

11.     Defendants' conduct prevented the expected price decrease and savings for purchasers that inevitably occurs upon generic entry. When a generic enters the market, sales predictably switch from the brand drug to the generic version. Generic drugs are priced well below the brand drug price, with prices for the generics falling farther as more generic manufacturers enter the market. Within six months to a year of entering the market, generics capture about 90% of the brand's unit sales.  The rate of generic substitution is not materially affected by the number of entrants, but the generic price decreases as the number of entrants increases. Defendants' conduct therefore results in damages to the Plaintiff and members of the direct purchaser class in the form of overcharges they paid for Xifaxan.

12.     As a result of Bausch's and Teva's unlawful conduct, a generic version of Xifaxan 550 mg is still not available seven years after the unlawful agreement with Teva, and more than three years after the Federal Circuit confirmed that key Bausch patents are invalid. Plaintiff and members of the direct purchaser class will likely continue to pay artificially high, monopoly prices for Xifaxan through January 2028 or beyond.

## II.   PARTIES

13.   Plaintiff KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc. is a corporation organized under the laws of the state of New York, with its principal place of business located at Gouverneur, New York. KPH is the assignee of McKesson Corporation who directly purchased Xifaxan during the class period. KPH has suffered antitrust injury as a result of the anticompetitive conduct alleged herein.

14.   Defendant Salix Pharmaceuticals, Ltd. is a corporation organized under the laws of Delaware with its principal place of business in Bridgewater, New Jersey.

15.   Defendant Salix Pharmaceuticals, Inc. is a corporation organized under the laws of California with its principal place of business in Bridgewater, New Jersey. Salix Pharmaceuticals, Inc. is a wholly owned subsidiary of Salix Pharmaceuticals, Ltd.

16.   On April 1, 2015, Valeant Pharmaceuticals International, Inc. acquired Salix Pharmaceuticals, Ltd. and, on or about that date, assumed its rights and obligations under the patents that were at issue in the patent litigation between Salix and Teva Pharmaceutical Industries Ltd. Effective on July 13, 2018, Valeant Pharmaceuticals International, Inc. changed its corporate name to Bausch Health Companies Inc. Salix Pharmaceuticals, Ltd. is now a wholly owned subsidiary of Bausch Health Companies Inc.

17.   Defendant Bausch Health Ireland Ltd. is a corporation organized and existing under the laws of Ireland, with its principal place of business in Dublin, Ireland.

18.   Defendant Bausch Health Companies Inc. is a corporation organized and existing under the laws of British Columbia, Canada with its U.S. headquarters in Bridgewater, New Jersey.

19.     Except where indicated otherwise, Defendants Bausch Health Ireland Ltd., Bausch Health Companies, Inc., Salix Pharmaceuticals, Ltd., and Salix Pharmaceuticals, Inc. are hereafter collectively referred to as "Bausch."

20.     Defendant Teva Pharmaceutical Industries Ltd. is a corporation incorporated under the laws of Israel, with its principal place of business in Tel Aviv, Israel.

21.     Defendant Teva Pharmaceuticals USA, Inc. is a Delaware corporation having its principal place of business in Parsippany, New Jersey.

22.     Defendant Actavis Laboratories FL, Inc., is a corporation incorporated under the laws of Florida, with its principal place of business in Davie, Florida. On August 2, 2016, Teva acquired Actavis Laboratories FL, Inc., which was the holder of ANDA No. 208959-one of the ANDAs at issue here-and thereby Teva became the owner of that ANDA.

23.     Except where indicated otherwise, Defendants Teva Pharmaceutical Industries Ltd., Teva Pharmaceuticals USA, Inc., and Actavis Laboratories FL, Inc. are hereafter collectively referred to as "Teva."

24.     All of the Defendants' and non-defendant co-conspirators' wrongful actions described in this complaint are part of, and in furtherance of, the illegal monopolization and restraint of trade alleged herein, and were authorized, ordered, and/or undertaken by the Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of the Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible authority of the Defendants.

### III.     JURISDICTION AND VENUE

25.     This action arises under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15(a) and 26, and seeks to recover threefold damages, permanent injunctive relief, the costs of suit and reasonable attorneys' fees for the injuries sustained by Plaintiff and members of the direct purchaser class resulting from Defendants' conspiracy to restrain trade in and Bausch's monopolization of the Xifaxan market. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a) and 15 U.S.C. § 15.

26.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and/or 28 U.S.C. §§ 1391(b) because during the class period, the Defendants were found and transacted business in this District, and a substantial portion of the alleged activity affected interstate trade and commerce discussed below has been carried out in this District.

27.     The drugs at issue in this case are sold in interstate commerce, and Defendants' conduct, as described in this Complaint, have occurred in, and have had a substantial effect on, interstate commerce.

28.     This Court has personal jurisdiction over each Defendant, because each Defendant—throughout the U.S. and including in this District—has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of its illegal scheme and conspiracy. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the U.S., including in this District.

## IV.    BACKGROUND

### A.  New Drug Applications and the listing of pharmaceutical patents in the FDA's Orange Book.

29.    Under the Federal Food, Drug, and Cosmetic Act ("FDCA"),[1] brand drug manufacturers that wish to sell a new drug product must obtain FDA approval by filing a New Drug Application ("NDA"). An NDA must include specific data concerning the safety and effectiveness of the drug, as well as information about patents.[2]

30.    The FDA approves new drugs based on their ability to satisfy the minimum regulatory requirements—namely, show that they are safe and effective to treat a particular indication. New drug applicants are not required to, and usually do not try to, show that their new drug product is better than other similar, already approved, products.

31.    When the FDA approves a brand manufacturer's NDA, the manufacturer may direct the FDA to list certain kinds of patents in the FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* (known as the "Orange Book")—i.e., patents that (i) claim the drug substance, drug product, or method of using the drug in the approved indication,[3] and (2) can "reasonably be asserted" against a generic manufacturer that makes, uses, or sells a generic version of the brand drug before the expiration of the listed patents. When a manufacturer obtains a new listable patent after the FDA has approved an NDA, it may direct FDA to list that patent in the Orange Book within 30 days of issuance.[4]

---

[1] 21 U.S.C. § 301 *et seq.*

[2] 21 U.S.C. § 355(a), (b).

[3] 21 U.S.C. § 355(b)(1)(A)(viii)

[4] 21 U.S.C. § 355(b)(1), (c)(2).

32. As described further below, when a patent is (properly) listed in the Orange Book, a brand manufacturer may sue a generic company for infringing that patent before the generic product is sold. If it does, the FDA cannot approve the generic manufacturer's drug application for two-and-a-half years.[5]

**B. The limits of patent protection for drugs**.

33. The existence of one or more patents purporting to claim a drug substance or drug product does not guarantee a brand drug company a monopoly over the drug. Patents are routinely invalidated or held unenforceable, either upon reexamination or *inter partes* proceedings by the U.S. Patent and Trademark Office ("PTO"), by court decision, or by jury verdict.

34. As discussed in greater detail below, under the framework set forth in the Hatch-Waxman Amendments, enacted in 1984,[6] a generic drug company can challenge patents ostensibly covering the branded drug. A patent infringement lawsuit by the patent holder within 45 days after notification of the generic drug company's challenge of the patents will trigger a 30-month stay of regulatory approval, during which the FDA cannot approve the generic drug.[7]

35. At all times, a patent holder bears the burden of proving infringement.

36. One way that a generic can prevail in patent infringement litigation is to show that its product does not infringe the patent (and/or that the patent holder cannot meet its burden to prove infringement). Another is to show that the patent is invalid or unenforceable.

---

[5] 21 U.S.C. §§ 355(c)(3)(C), (j)(5)(B)(iii)

[6] Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (codified as amended at 21 U.S.C. § 355), available at https://www.govinfo.gov/content/pkg/STATUTE-98/pdf/STATUTE-98-Pg1585.pdf (last accessed June 13, 2024).

[7] 21 U.S.C. § 355(j)(5)(B)(iii).

37.    A patent is invalid or unenforceable when, e.g., (i) the disclosed invention is anticipated or obvious in light of earlier prior art, sale or use;[8] (ii) when an inventor, an inventor's attorney, or another person involved with the application, with intent to mislead or deceive the PTO, fails to disclose material information known to that person to be material, or submits materially false information to the PTO during prosecution; and/or (iii) when a later-acquired patent is not patentably distinct from the invention claimed in an earlier patent (and no exception, such as a terminal disclaimer applies).

38.    In these circumstances, the PTO's decision to issue a patent does not substitute for a fact-specific assessment of (i) whether the applicant made intentional misrepresentations or omissions on which the PTO relied in issuing the patent, (ii) whether a reasonable manufacturer in the patent holder's position would have a realistic likelihood of succeeding on the merits of a patent infringement suit, or (iii) whether a patent may be "reasonably asserted" against a competitor or otherwise properly listed in the Orange Book.

39.    As a statistical matter, if the parties litigate a pharmaceutical patent infringement suit to a decision on the merits, it is more likely that a challenged patent will be found invalid or not infringed than upheld. The Federal Trade Commission ("FTC") reports that generics prevailed in 73% of Hatch-Waxman patent litigation cases resolved on the merits between 1992 and 2002.[9] An empirical study of all substantive decisions rendered in every patent case filed in

---

[8] Other actions by the patentee, that are less relevant here, can invalidate or otherwise render a patent unenforceable. While not an exhaustive list, such actions include failure to name the correct inventors, failure to adequately describe and claim the invention, failure to pay required maintenance fees to the PTO. Licenses and ownership transfers can render a patent unenforceable against a particular infringer, and laches and estoppel can apply when a patent holder delays too long to bring suit against a known infringer.

[9] FTC, Generic Drug Entry Prior to Patent Expiration: An FTC Study vi-vii (2002), available at https://www.ftc.gov/sites/default/files/documents/reports/generic-drug-entry-prior-patent-expiration-ftc-study/genericdrugstudy_0.pdf (last accessed June 13, 2024).

2008 and 2009 similarly reports that when a generic challenger stays the course until a decision on the merits, the generic wins 74% of the time.[10]

40.    If a generic manufacturer successfully defends against the brand's infringement lawsuit—either by showing that its proposed generic product does not infringe any asserted patents and/or that any asserted patents are invalid or unenforceable—the generic may enter the market immediately upon receiving approval from the FDA.

**C. Congress deliberately eased the approval process for generic manufacturers**.

41.    A drug company that wants to sell a generic drug must file an Abbreviated New Drug Application ("ANDA") with the FDA.

42.    To expedite the availability of affordable generic drugs, and as a matter of good science, Congress determined that generic drug manufacturers do not have to establish the safety and efficacy of the generic versions of brand drugs, because the safety and efficacy of the brand drugs were established by the brand manufacturer at the NDA approval stage. Through the Hatch-Waxman Amendments, Congress reduced the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs.

43.    Instead, an ANDA applicant must show that the drug product described in the ANDA is bioequivalent to or "the same as" the brand drug;[11] that is, that the generic product contains the same active ingredient, conditions of use, route of administration, dosage form,

---

[10] John R. Allison, Mark A. Lemley & David L. Schwartz, *Understanding the Realities of Modern Patent Litigation*, 92 TEX. L. REV. 1769, 1787 (2014) ("[P]atentees won only 164 of the 636 definitive merits rulings, or 26%," and "that number is essentially unchanged" from a decade ago.), available at http://texaslawreview.org/wp-content/uploads/2015/08/AllisonEtAl-92-7.pdf (last accessed June 13, 2024).

[11] *See* 21 U.S.C. § 355(j)(2)(A)

strength, rate and extent of absorption (bioequivalence), and—with certain permissible differences—labeling as the reference listed drug.

44.    Having done so, the ANDA applicant may rely on the FDA's previous finding that the brand drug product is safe and effective because—as a matter of good science and decades of experience—there is no reason to believe that the generic product would behave differently in the body than the brand product. If a generic application meets those criteria relative to its brand counterpart, the FDA assigns the generic drug an "AB" rating for oral solid dosage forms (e.g., tablets and capsules).

45.    The FDA has considerable flexibility in determining how the bioequivalence requirements are satisfied.

**(1) The Paragraph IV certification process**.

46.    To obtain FDA approval of an ANDA, a manufacturer must certify that the generic drug will not infringe any patents listed in the Orange Book. Under the Hatch-Waxman Amendments, a generic manufacturer's ANDA must, unless a claimed method of use will not be used by the manufacturer, contain one of four certifications:

i.    that no patent for the brand drug has been filed with the FDA (a "Paragraph I certification");

ii.    that the patent for the brand drug has expired (a "Paragraph II certification");

iii.    that the patent for the brand drug will expire on a particular date and the manufacturer does not seek to market its generic product before that date (a "Paragraph III certification"); or

iv.    that the patent for the brand drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification"). 21 U.S.C. § 355(j)(2)(A)(vii).

47.    If a generic manufacturer files a Paragraph IV certification, it must notify the brand manufacturer and provide the brand manufacturer with detailed information that the proposed generic does not infringe the listed patents or that the patents are invalid.[12] The brand manufacturer can delay FDA approval of the ANDA simply by suing the ANDA applicant for patent infringement. If the brand manufacturer initiates a patent infringement action against the generic filer within forty-five days of receiving notification of the Paragraph IV certification, the FDA will not grant final approval of the ANDA until the earlier of (a) the passage of 30 months, or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA.[13]

48.    Until one of those conditions occurs, the FDA may grant "tentative approval," but cannot authorize the generic manufacturer to market its product (*i.e.*, grant final approval). The FDA may grant an ANDA tentative approval when it determines that the ANDA would otherwise be ready for final approval but for the 30-month stay blocking final approval.

**(2) The 180-day exclusivity period for a first filing generic**.

49.    Generics may be classified in several different ways. They can be classified as (i) first-filer generics, (ii) later generic filers, and (iii) the brand's own authorized generic or AG (which is essentially the brand name product without the brand name).

50.    To encourage manufacturers to seek approval of generic versions of brand drugs, the Hatch-Waxman Amendments grant the first generic manufacturer who files an ANDA with a Paragraph IV certification (the "first-filer") a 180-day period to market the generic version of the

---

[12] 21 U.S.C. § (j)(2)(A)(iv)(III).

[13] 21 U.S.C. § 355(j)(5)(B)(iii).

drug, during which time the FDA may not grant final approval to any other generic

manufacturer's ANDA for the same brand drug.

51.     When a first-filer files a substantially complete ANDA with the FDA and certifies

that the unexpired patents listed in the Orange Book as covering the brand product are either

invalid or not infringed by the generic's product, the FDA cannot approve a later generic

company's ANDA until that first-filing generic has been on the market for 180 days, or until the

first-filer exclusivity has been forfeited. The 180-day window is referred to as the first-filer's six

month or 180-day "exclusivity" period.

52.     This description is somewhat of a misnomer, because a brand drug manufacturer

(such as Bausch) can launch what is called an authorized generic ("AG") or unbranded version

of its own brand drug, under its own NDA, at any time.  Brand companies frequently do so in

response to actual or anticipated generic entry in order to recoup some of the sales they would

otherwise lose.

53.     To be eligible for the 180-day first-filer exclusivity, an ANDA applicant must:

(1) file the first substantially complete ANDA, (2) challenge the brand's patent(s), and (3) obtain

tentative approval within 30 months (two and a half years) of filing.

54.     The FDA grants "tentative approval" to an ANDA that meets the conditions of

approval and is ineligible for final approval because of an unexpired exclusivity or stay.

55.     If a first-filer does not obtain tentative approval within 30 months of filing its

ANDA (with one exception), it forfeits its 180-day exclusivity.[14]

56.     A first-filer can also forfeit exclusivity as to any later filers when: (1) a later filer

receives a final judgment that their proposed ANDA product either does not infringe the patents

---

[14] 21 U.S.C. § 355(j)(5)(D)(i)(IV).

certified against by the first filer or that such patents are invalid; and (2) the first filer fails to market before 75 days have passed since such judgment from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken.[15]

**D. The Competitive Effects of AB-Rated Generic Competition.**

57.    Generic versions of brand drugs contain the same active ingredient and are determined by the FDA to be just as safe and effective as their brand counterparts. The only material difference between generic drugs and their corresponding brand versions is their price.

58.    Experience and economic research show that the first generic manufacturer to launch prices its product below the prices of its brand counterpart.[16] Every state either requires or permits that a prescription written for the brand drug be filled with an AB-rated generic. Thus, the first generic manufacturer almost always captures a large share of sales from the brand form of the drug. At the same time, there is a reduction in average price paid for a prescription for the drug at issue (brand and AB-rated generic combined).

59.    If there is no AG on the market during the 180-day exclusivity period—or any other period where there is just one generic available—then such generic is priced below the brand product, but not as low as it would if it were facing competition from other generics.

---

[15] 21 U.S.C. 355(j)(5)(D)(i)(I)(bb)(AA).

[16] FTC, AUTHORIZED GENERIC DRUGS: SHORT-TERM EFFECTS AND LONG-TERM IMPACT, at ii-iii, vi, 34 (Aug. 2011) ("FTC 2011 AG Study"), *available at* https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf (last accessed June 13, 2024); FTC Staff Study "Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions", at 1, available at https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf (last accessed June 13, 2024).

60.     Since in these circumstances, the generic competes only with the brand product, and because the brand company rarely drops the brand product price to match the generic, the exclusive generic does not face the kind of price competition it will when additional generic products, including an AG, are available. Thus, a first-filer or other exclusive generic earns much greater sales and profits without an AG being marketed alongside it during any period of exclusivity.

**(1) Later generics drive prices down further**.

61.     Once multiple generic competitors enter the market, the competitive process accelerates and multiple generic sellers typically compete vigorously with each other over price, driving prices down toward marginal manufacturing costs.

62.     Soon after generic competition begins, the vast majority of the sales formerly enjoyed by the brand shift to generic sellers. In a report by the FTC issued at the request of Congress in 2011, the FTC found that generics captured 80% or more of sales in the first six months.[17] In the end, total payments to the brand manufacturer of the drug decline to a small fraction of the amounts paid prior to generic entry.

63.     FDA reports that generic drugs saved the U.S. healthcare system nearly $2.2 trillion from 2009 to 2019.

**(2) AGs compete on price, like other generics**.

64.     As described above, nothing prevents a brand manufacturer from selling an AG at any time. An AG is chemically identical to the brand drug and manufactured under the brand's approved NDA, but is sold as a generic product typically through either the brand manufacturer's subsidiary (if it has one) or through a third-party distributor. An AG is essentially the brand drug

---

[17] FTC 2011 AG Study, at 66-67.

but in a different package, without the brand name. One study notes that "pharmaceutical developers facing competition from generics have large incentives to compete with their own or licensed 'authorized generics.'"[18] Brand manufacturers sometimes begin selling AGs before the first generic launches, in order to secure multi-year purchase contracts with direct purchasers and load the generic pipeline at the expense of the first-filer or other exclusive generic.

65.    Competition from an AG substantially reduces drug prices and the revenues of the first generic (especially if the first generic has 180-day or some other form of exclusivity that prohibits or delays any other ANDA generic from entering the market).

66.    The FTC found that AGs capture a significant portion of sales, reducing the first-filer generic's revenues by approximately 50% on average.[19] A first generic makes much less money when it faces competition from an AG because (a) the AG takes a large share of unit sales and (b) the presence of the AG causes prices, particularly generic prices, to decrease.

**E.  Abuse of the Regulatory Structure by Drug Companies**.

67.    Brand manufacturers and generic manufacturers are typically marketplace competitors.

68.    Unfortunately for purchasers like Plaintiff, it is relatively common for brand and generic manufacturers of pharmaceuticals to conspire in order to maintain high prices, protect their profits, and split between themselves the enormous savings that increased generic competition would have delivered to drug purchasers.

---

[18] K. A. Hassett & R. J. Shapiro, *The Impact of Authorized Generic Pharmaceuticals on the Introduction of Other Generic Pharmaceuticals*, SONECON, p. 3 (May 2007) available at https://www.sonecon.com/docs/studies/050207_authorizedgenerics.pdf (last accessed June 13, 2024).

[19] FTC 2011 AG Study, at 139.

69.     For such an anticompetitive pact to work, brand and generic manufacturers need a means by which to divide between them the ill-gotten gains—the increased profit to the detriment of drug purchasers—that delayed competition makes possible. The means usually takes the form of payoffs from the brand manufacturer, deals that are often referred to as "pay-for-delay," "exclusion payment," or "reverse payment" agreements. They are called "reverse payment" agreements because, instead of the alleged patent infringer paying royalties to the patent holder, the patent holder pays the alleged infringer to keep the infringing product off the market, that is, the patent holder is essentially paying the alleged infringer to delay market entry and drop challenges to possibly unenforceable or invalid patents.

70.     While the form of the "reverse payments" from the brand to the generic can vary, such as direct monetary compensation or granting periods of exclusivity, the goal is the same: to entice the generic manufacturer not to compete.

71.     ANDA filers who enter, or expect to enter, after the initial entry by the conspiring generic manufacturer have more modest financial expectations because they may have little or no expectation of any form of market exclusivity. By the time they enter the market, there is at least the brand and one other generic on the market (and often a second generic in the form of an AG) and, thus, the drug has already been, or is on its way to being, commoditized.

72.     Thus, such later entering generics often decide to simply give in to or join the conspiracy between the brand manufacturer and the generic with exclusivity rights, agree to drop their challenges to the brand manufacturer's patent(s), and stay off the market until well after entry by the initial generic. Patents with dubious validity and enforceability are left unchallenged, blocking further generic entry. This behavior furthers the harm to drug purchasers.

73.     These pay-for-delay agreements are fundamentally anticompetitive and contrary to the goals of the Hatch-Waxman statutory scheme. In particular, they extend the brand manufacturer's monopoly by blocking access to more affordable generic drugs, forcing purchasers to buy expensive brands instead.

**(1) Reverse payments are a means to delay competition**.

74.     In a typical reverse payment agreement, the brand manufacturer pays a generic manufacturer to (i) delay or abandon market entry, and (ii) abandon the invalidity and unenforceability challenges to the brand manufacturer's patents. The brand manufacturer preserves its monopoly by paying some of its monopoly profits to the generic manufacturer, and the generic manufacturer agrees to delay marketing its product, allowing the brand manufacturer to have an extended monopoly period.

75.     The size of the payment is usually a proxy for assessing the patent merits. As the Supreme Court observed in *F.T.C. v. Actavis, Inc*., 570 U.S. 136, 157–58 (2013), "[t]he owner of a particularly valuable patent might contend, of course, that even a small risk of invalidity justifies a large payment. But, be that as it may, the payment (if otherwise unexplained) likely seeks to prevent the risk of competition." In other words, the Court went on, "the size of the unexplained reverse payment can provide a workable surrogate for a patent's weakness . . . ."

### a.  A brand manufacturer's payment of cash to a generic manufacturer to stay out of the market is one clear example of a reverse payment.

76.     One clear example of a reverse payment occurs when a patentee pays an alleged infringer in cash to end a lawsuit.

77.     As a result of regulatory scrutiny, congressional investigations, and class-action lawsuits, reverse payments in cash are now relatively uncommon.

78.     However, they do still happen, as shown by Bausch's monetary payment to Teva in this case in exchange for Teva's not launching a generic Xifaxan.

> ### b.  "No-authorized generic" agreements are another form of a reverse payment that allow brand and generic manufacturers to share the gains from conspiring.

79.     Another example, also at issue here, is when a brand manufacturer agrees not to market an AG version of the brand drug—or structures the settlement so that it would make no economic sense for the brand to launch an AG (i.e., a *de facto* no-AG agreement)—for some period of time after the first generic enters the market, in exchange for the first generic agreeing to a delayed entry date.

80.     The U.S. Federal Trade Commission has conducted a study and issued an August 2011 report entitled Authorized Generic Drugs: Short Term Effects and Long Term Impact: A Report of the Federal Trade Commission ("Report"), which concluded that "there is strong evidence that agreements not to compete with an authorized generic have become a way for brand-name companies to compensate generic competitors for delaying entry." The Report further noted:

> These agreements can be part of "pay-for-delay" patent settlements, which have long concerned the Commission. These agreements involve a brand name firm compensating a generic and the generic agreeing to delay its entry. One form that compensation can take is the brand's commitment, in exchange for the first-filer's agreement to delay entry, not to sell an AG during the first filer's 180 market exclusivity period. Because the first   filer's revenue will approximately double absent an authorized generic, its revenue will  be much larger by agreeing to delay than if it litigated, won and faced AG competition.
>
> The generic firm benefits from greater profits during the 180 day exclusivity; the brand- name firm benefits from later generic entry; but consumers suffer from delay of generic competition. Because generics often are priced substantially below the price of brand name drugs, even a few additional months without generic competition can significantly increase overall prescription drug costs.

***

The frequency of this practice and its profitability make it an attractive way to structure a pay-for-delay settlement, a practice that causes substantial consumer harm.

81.     The promise of payment to a first-filer or other exclusive generic in the form of an agreement not to launch an AG is economically equivalent to the promise of a cash payment by the brand manufacturer to the generic. By refraining from launching an AG under the agreement, the brand manufacturer forgoes the sales and revenues it otherwise would have made with its AG, which significantly and predictably increases the revenues and profits of the generic company who can sell its product without other generic competition.

82.     There is no statutory prohibition on a brand manufacturer launching an AG when it desires, including during any period of exclusivity for the first generic.

83.     Absent a no-AG promise, it almost always makes economic sense for the brand manufacturer to begin marketing an AG as soon as (or sometimes weeks or months before) the first generic enters the marketplace.

84.     With respect to a first-filer or other exclusive generic, competition from an AG has a drastically negative effect on its revenues. As discussed, an AG typically takes a substantial volume of the unit sales and drives prices lower—delivering commensurate savings to drug purchasers.

85.     In light of this economic reality, a first-filer or other generic may be willing to delay its entry into the marketplace in return for the brand manufacturer's agreement to forgo competing with an AG during an exclusivity period.

86.     The additional monopoly profits that the brand manufacturer gains from the delayed onset of generic competition more than makes up for the profits it forgoes by temporarily not competing with its AG. The brand manufacturer gains from the delayed onset of

generic competition; a first-filer or other generic with exclusivity gains from the absence of generic competition for a period of time after it launches.

87.     Conversely, drug purchasers like Plaintiff here, lose. The brand and generic's reciprocal pledges not to compete harm purchasers in multiple ways. First, the pact delays generic entry into the marketplace and thereby extends the time during which the more expensive brand is the only product on the market. Second, the pact prevents or is structured to disincentivize the brand from marketing an AG during any 180-day or other exclusivity period (or beyond), reducing price competition during that period, particularly price competition that would otherwise occur between the generic and the brand's AG.

88.     For a first-filer or other generic with exclusivity, the difference between selling the only generic and competing against an AG can amount to tens or even hundreds of millions of dollars, depending on the size of the brand's sales. A no-AG pledge thus has the same economic effect as a payoff made in cash, with even greater anticompetitive consequences as it removes a competitor. As explained by the then-Chairman of the FTC:

> Because the impact of an authorized generic on first-filer revenue is so sizable, the ability to promise not to launch an AG is a huge bargaining chip the brand company can use in settlement negotiations with a first-filer generic. It used to be that a brand might say to a generic, "if you go away for several years, I'll give you $200 million." Now, the brand might say to the generic, "if I launch an AG, you will be penalized $200 million, so why don't you go away for a few years and I won't launch an AG."[20]

---

[20] "Statement of Chairman Jon Leibowitz on the Release of the Commission's Interim Report on Authorized Generics," FTC (June 24, 2009), *available at* https://www.ftc.gov/sites/default/files/documents/reports/authorized-generics-interim-report-federal-trade-commission/p062105authgenstatementleibowitz.pdf (last accessed June 13, 2024).

89.     Courts agree that no-authorized generic agreements are a form of payment actionable under *Actavis* and are anticompetitive.[21]

90.     When a brand manufacturer agrees to a no-AG clause in exchange for delaying generic entry, the additional profits gained by causing delay to generic competition to achieve a longer monopoly period significantly outweighs any profit that could have been gained from selling an AG. The bottom line is that the brand manufacturer gains a longer period of monopoly profits by delaying the onset of generic competition, and the generic maintains higher generic sales and pricing during its exclusivity period. Thus, no-AG agreements allow competitors to benefit from an agreement not to compete and deny purchasers the consumer surplus that should flow to them from increased competition.

91.     No-AG agreements need not be explicit to achieve their anticompetitive ends. According to the FTC, another "common" form of "possible compensation" to the settling generic is an agreement containing "a declining royalty structure, in which the generic's obligation to pay royalties is reduced or eliminated if a brand launches an authorized generic

---

[21] *See In re Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538, 549-50 (1st Cir. 2016); *In re Opana ER Antitrust Litig.*, 162 F.Supp.3d 704, 719–20 (N.D. Ill. 2016); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 242 (D. Conn. 2015); *United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1069-71 (N.D. Cal. 2014); *In re Effexor XR Antitrust Litig.*, No. 11-cv-5479, 2014 WL 4988410, at *20-21 (D.N.J. Oct. 6, 2014); *Time Ins. Co. v. Astrazeneca AB*, 52 F. Supp. 3d 705, 709–10 (E.D. Pa. 2014); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 751 (E.D. Pa. 2014); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 392 (D. Mass. 2013).

product."[22]  As FTC has stated, "[t]his type of provision may achieve the same effect as an explicit no-AG commitment."[23]

92.    And as courts have observed, an "explicit reservation . . . does not on its own preclude the existence of an implicit no-AG agreement."[24]

## V.    FACTUAL ALLEGATIONS

### A.  The Long History of Rifaximin and Bausch's Weak Patent Portfolio.

93.    Rifaximin, the active ingredient in Xifaxan, has been widely used as an antibiotic for decades.

94.    Irritable bowel syndrome is characterized by symptoms including abdominal pain, bloating, frequency, urgency, gas, and changed bowel habits, such as diarrhea, constipation, or alternating diarrhea and constipation. Subtypes of IBS include IBS with diarrhea (IBS-D), IBS with constipation (IBS-C), or IBS with alternating diarrhea and constipation (IBS-A).

95.    The IBS-D subtype comprises about one-third of IBS patients. IBS may be caused, for example, by abnormal motility, abnormal muscular coordination, changes in the microbiome in the colon or small intestine, intolerance to certain foods, or psychological factors.

96.    On December 21, 2001, Salix (Bausch's subsidiary) submitted NDA No. 021361 for rifaximin tablets to be marketed and sold under the brand name Xifaxan 200 mg, indicated

---

[22] FTC, Bureau of Competition, Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003: Overview of Agreements Filed in FY 2017 (2018), at 2, available at https://www.ftc.gov/system/files/documents/reports/agreements-filed-federal-trade-commission-under-medicare-prescription-drug-improvement-modernization/mma_report_fy2017.pdf (last accessed June 13, 2024).

[23] *Id.*

[24] *Picone v. Shire*, No. 16-cv-12396, 2017 WL 4873506, at *9 (D. Mass. Oct. 20, 2017).

for the treatment of patients (>12 years of age) with travelers' diarrhea (TD) caused by noninvasive strains of *E. coli*. The FDA approved the NDA on May 25, 2004.

97.     On June 24, 2009, Salix submitted NDA No. 022554 for rifaximin tablets to be marketed and sold under the brand name Xifaxan 550 mg, indicated for the treatment the reduction in risk of overt hepatic encephalopathy (HE) recurrence in adults. On June 7, 2010, Salix submitted a Supplemental New Drug Application ("sNDA") for Xifaxan 550 mg, introducing a new indication for the treatment of IBS-D in adults.

98.     On March 24, 2010, the FDA granted the NDA with respect to the hepatic encephalopathy indication.

99.     In 2010 the FDA approved Xifaxan 550 mg tablets. Xifaxan 550 mg tablets have been indicated for: (i) treatment of TD  caused by noninvasive strains of *E. coli* in adult and pediatric patients 12 years of age and older; (ii) reduction in risk of overt HE recurrence in adults; and (iii) treatment of IBS-D in adults. The official website for Xifaxan currently states that "XIFAXAN® (rifaximin) 550 mg tablets are indicated for the reduction in risk of overt hepatic encephalopathy (HE) recurrence in adults and for the treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults."[25]

100.     On May 27, 2015, FDA approved the sNDA for Xifaxan 550 mg for the treatment of IBS-D in adults.

101.     Xifaxan was a top seller for Salix and a primary reason that Bausch acquired Salix in 2015.

102.     Salix filed, prosecuted, and listed in the Orange Book over the years at least 30 patents claiming Xifaxan 550 mg or its uses. However, the patents were weak and unlikely to

---

[25] https://www.xifaxan.com/.

withstand challenges by generic manufacturers. Some of the patents did not claim Xifaxan 550 mg or any of its uses and therefore could not lawfully be listed in the Orange Book.

103.    By 2016, Salix had obtained and listed in the FDA's Orange Book 22 patents claiming aspects of Xifaxan 550 mg and its uses, with expiration dates ranging from August 11, 2019 to October 2, 2029. By 2023, the patents listed in the Orange Book for Xifaxan 550 mg and its uses no longer included the patents that had already expired in 2019, but the number of listed patents had grown to 24, and by 2024 had grown further to 26.

104.    The earliest-expiring of the patents listed in the Orange Book claimed methods of using the prior art rifaximin compound, Xifaxan's active ingredient, for various indications such as treating irritable bowel syndrome and treating bloating. These patents expired on August 11, 2019.

105.    The remaining listed patents have expiration dates ranging from June 19, 2024 to October 2, 2029. They fall into three general categories: (i) patents claiming various distinct crystalline forms or polymorphs of rifaximin ("polymorph patents"); (ii) patents claiming methods of treating IBS with rifaximin ("IBS patents"); and (iii) patents claiming methods of using rifaximin to treat hepatic encephalopathy ("HE patents"), as shown below:

| Patent | Expiration | Submission | Coverage |
| --- | --- | --- | --- |
| 6,861,053 | 8/11/2019 | n/a | IBS |
| 7,452,857 | 8/11/2019 | n/a | IBS |
| 7,605,240 | 8/11/2019 | n/a | IBS |
| 7,718,608 | 8/11/2019 | n/a | IBS |
| 7,935,799 | 8/11/2019 | n/a | IBS |
| 7,045,620 | 6/19/2024 | n/a | Polymorph |

| 7,612,199 | 6/19/2024 | 4/7/2011 | Polymorph |
|---|---|---|---|
| 7,902,206 | 6/19/2024 | 4/7/2011 | Polymorph |
| 8,158,644 | 6/19/2024 | 5/9/2012 | Polymorph |
| 8,158,781 | 6/19/2024 | 5/8/2012 | Polymorph |
| 8,835,452 | 6/19/2024 | 10/1/2014 | Polymorph |
| 8,853,231 | 6/19/2024 | 11/5/2014 | Polymorph |
| 7,915,275 | 2/23/2025 | 6/18/2015 | Polymorph |
| 7,906,542 | 6/1/2025 | 4/7/2011 | Polymorph |
| 8,518,949 | 2/27/2026 | 9/16/2013 | Polymorph |
| 8,741,904 | 2/27/2026 | 7/11/2014 | Polymorph |
| 9,271,968 | 2/27/2026 | 6/8/2016 | Polymorph |
| 10,703,763 | 2/27/2026 | 7/14/2020 | Polymorph |
| 8,193,196 | 9/2/2027 | 6/18/2012 | Polymorph |
| 10,456,384 | 2/26/2029 | 11/12/2019 | IBS |
| 10,765,667 | 2/26/2029 | 10/19/2020 | IBS |
| 11,564,912 | 2/26/2029 | 2/2/2023 | IBS |
| 11,779,571 | 2/26/2029 | 10/23/2023 | IBS |
| 8,309,569 | 7/18/2029 | 6/18/2015 | IBS |
| 8,829,017 | 7/24/2029 | 9/9/2014 | HE |
| 8,946,252 | 7/24/2029 | 2/3/2015 | HE |
| 9,421,195 | 7/24/2029 | 10/11/2016 | HE |
| 9,629,828 | 7/24/2029 | 4/27/2017 | HE |
| 10,314,828 | 7/24/2029 | 7/1/2019 | HE |

| 10,335,397 | 7/24/2029 | 7/24/2019 | HE |
| 10,709,694 | 7/24/2029 | 7/23/2020 | HE |
| 8,642,573 | 10/2/2009 | n/a | HE |
| 8,969,398 | 10/2/2009 | 3/4/2015 | HE |

106.    Like many active pharmaceutical ingredients, Rifaximin may exist in a number of different crystalline forms (known as polymorphs). The '620, '199, '206, '275, '542, '644, '781, '196, '949, '904, '452, '231 and '968 patents claim some of these rifaximin polymorphs.

107.    For example, the '620, '199, '206, '275, '542, '644, '452, '231 and '781 patents claim the alpha, beta, and gamma rifaximin polymorphs, including those made by a specific process, compositions containing the same and uses for the same. The '196, '949, '904, and '968 patents claim the delta and epsilon rifaximin polymorphs, including those made by a specific process, compositions containing the same and uses for the same.

108.    All these polymorph patents were subject to validity challenges.  Moreover, they were specific to a particular polymorph or to particular properties or methods of making a given polymorph, making it relatively easy for a generic manufacturer to avoid infringing these patents even if they were valid.

109.    The patents that expired in 2019 claimed certain methods of using rifaximin in patients with IBS, but without specific dosing regimens. Some of the patents expiring after 2019 are directed to the same or similar treatment indications as those that expired in 2019, but have claims reciting specific dosing regimens or target patients. For example, the '608 and '799 patents, both of which expired on August 11, 2019, claimed a method of treating a subject suffering from IBS and a method of treating a subject who has relapsing diarrhea from small

intestinal bacterial overgrowth comprising administering rifaximin to the subject in need. The later-expiring '569 patent is directed to certain methods of using rifaximin at a dose of 1650 mg/day for 14 days for the treatment of IBS-D in order to achieve a "durability of response" (about 12 weeks of adequate relief of symptoms). Similarly, the '667 patent claims a method of treating IBS in a subject 65 years of age or older by administering 550 mg of rifaximin three times a day for 14 days, and also had dependent claims claiming treatment of specific symptoms or types of IBS such as where the IBS is IBS-D.

110.    Regardless of the merits of the patents expiring in 2019, those patents all would have been avoided by generics entering the market after the patents' August 11, 2019 expiration. As for the later-expiring patents, they are all subject to serious validity challenges and/or claim specific indications that a generic manufacturer easily could avoid.

111.    Nine listed patents claim treatment methods specific to hepatic encephalopathy through administering rifaximin.

112.    For example, the '573 patent covers certain methods of "maintaining remission of hepatic encephalopathy" by "administering . . . rifaximin daily to a subject for a period of about 12 months or longer."

113.    The '017 patent covers certain methods of using rifaximin at a dose of 1,000-1,200 mg/day and "cautiously" for the treatment of hepatic encephalopathy in patients who also have travelers' diarrhea and either a Child-Pugh Class C score or a model end stage liver disease score of 25 or greater.

114.    The '252 patent covers certain methods of using rifaximin to reduce the risk of HE recurrence in certain patients who have travelers' diarrhea and hepatic insufficiency.

115.    The '398 patent covers certain methods of using "rifaximin daily for a period of

about 12 months or longer" to decrease a subject's risk of an HE breakthrough episode.

116.    The '195 patent covers methods of using rifaximin at a dose of 1,000-1,200 mg/day "for a period of 12 months or longer" to reduce the risk of HE recurrence in adults.

117.    The '828 patent covers methods of using rifaximin at a dose of 1,000-1,200 mg/day to reduce the risk of HE recurrence in certain patients who have travelers' diarrhea and chronic liver disease.

118.    These patents are all specific to treating HE, so a generic could easily avoid these patents by carving out these HE indications in its labeling via a section viii statement.

119.    In sum, each of the post-2019-expiring listed patents claiming methods of treating IBS indications and each of the listed polymorph patents was vulnerable to challenges regarding validity, enforceability, and infringement.

120.    In fact, as explained below, the Court of Appeals for the Federal Circuit affirmed a district court's judgment finding that the claims of the IBS and polymorph patents that Bausch asserted against a manufacturer of generic Xifaxan were invalid as obvious in view of the prior art.  Specifically, the court invalidated the claims of the representative later-expiring '569 and '667 patents directed to treating IBS-D with 550 mg rifaximin three times a day for 14 days and claims of the representative later-expiring '199 and '206 patents directed to rifaximin form beta. *See Salix Pharms., Ltd. v. Norwich Pharms. Inc.*, 98 F.4th 1056 (Fed. Cir. 2024).

121.    The substantial vulnerability and weakness of all the IBS and polymorph patents meant that none stood as legitimate impediments to generic competition. By listing them in the Orange Book, however, Bausch ensured that every potential generic competitor would have to address them.

122.    Actavis Laboratories FL, Inc. ("Actavis"), a generic manufacturer subsequently

acquired by Teva, was the first to file an ANDA seeking approval to manufacture, market, and sell a generic version of Xifaxan 550 mg. Actavis filed ANDA No. 208959 in or about February 2016 directed to Xifaxan 550 mg. As the first generic to submit a substantially complete ANDA for rifaximin, Actavis was eligible for the 180-day ANDA exclusivity period for generic Xifaxan 550 mg tablets.

123.    On February 11, 2016, Actavis sent a paragraph IV certification to Bausch, asserting that the following patents are invalid, unenforceable, or will not be infringed by the activities described in Actavis's ANDA: the '569 patent; the '573 patent; the '017 patent; the '252 patent; the '398 patent; the '620 patent; the '199 patent; the '206 patent; the '542 patent; the '275 patent; the '644 patent; the '781 patent; the '196 patent; the '949 patent; the '904 patent; the '452 patent; the '231 patent; the '053 patent; the '857 patent; the '240 patent; the '608 patent; and the '799 patent.

124.    Actavis provided Bausch with the factual and legal basis supporting its position that these patents are invalid, unenforceable, or would not be infringed by Actavis's proposed ANDA products.

125.    On March 23, 2016, Bausch filed suit against Teva in the U.S. District Court for the District of Delaware (the "Bausch-Teva Litigation"), alleging that Actavis infringed one or more claims of the '569, '573, '017, '252, '398, '620, '199, '206, '542, '275, '644, '781, '196, '949, '904, '452, '231, '053, '857, '240, '608, and '799 patents. Pursuant to the Hatch-Waxman Amendments, the mere filing of the action triggered an automatic 30-month stay of the approval of Actavis's ANDA. Later in the litigation, Bausch amended its complaint to add new allegations that Actavis also infringed the '968 and '195 patents.

126.    Actavis filed its answer to the claims, denying Bausch's allegations and asserting

affirmative defenses and counterclaims (1) denying that its rifaximin tablets would infringe claims of any of the asserted patents, (2) alleging that the asserted patents were invalid, and (3) alleging that the asserted patents were unenforceable due to Bausch's inequitable conduct during prosecution.

127.    On June 14, 2016, Bausch filed its First Amended Complaint, adding U.S. patent 9,271,968 (the "'968 patent") to the suit. Actavis filed its Amended Answer and Counterclaims on July 1, 2016. Bausch filed its Reply on July 18, 2016.

128.    On August 2, 2016, Teva acquired Actavis and thereby became the owner of ANDA No. 208959 and a participant in the Bausch-Teva Litigation.

129.    On October 5, 2016, the court scheduled a seven-day trial to begin on January 29, 2018.

130.    On December 12, 2016, Bausch filed its Second Amended Complaint, adding U.S. patent 9,421,195 (the "'195 patent") to the suit. Teva filed its Second Amended Answer and Counterclaims on December 27. Bausch filed its Reply on January 10, 2017.

131.    On May 10, 2017, at Teva's request, the parties agreed to a roughly one-year suspension of the litigation that would last until April 30, 2018. All scheduled litigation deadlines and events, including the January 2018 trial date, were indefinitely removed from the Court docket. The parties subsequently requested that the stay be extended four more times, ultimately extending the hiatus to October 1, 2018.

132.    The Bausch-Teva Litigation involved 24 patents (either asserted by Bausch against Teva or introduced by Teva in its declaratory judgment counterclaims). Teva had strong defenses to all those patents. None presented a reason for Teva to agree to wait until 2028 to enter the market with a generic Xifaxan 550 mg.

133.    As described above, the patents asserted against Teva fell into four groups: IBS method-of-treatment patents expiring on August 11, 2019; IBS-D method-of-treatment patents with specific dosing regimens and/or target subjects expiring in 2029; polymorph patents expiring between June 2024 and September 2027; and HE method-of-treatment patents expiring in 2029.

134.    By the time Bausch and Teva settled the patent case in September 2018, the IBS method of treatment patents expiring on August 11, 2019 had less than one year of life left and thus, even if they were valid, infringed and enforceable, they presented no reason for Teva to agree to wait a day beyond August 11, 2019 to enter the market—let alone until 2028.

135.    Teva had strong validity challenges to the IBS-D method of treatment patents with specific dosing regimens and/or target subjects expiring in 2029, and those patents were exceptionally vulnerable to being invalidated. Indeed, the representative '569 and '667 patents were invalidated later in the *Salix v. Norwich* action.

136.    Similarly, Teva had strong validity challenges to the polymorph patents and those patents were, similarly, exceptionally vulnerable to being invalidated, as again evidenced by the invalidation in the *Salix v. Norwich* action of the representative '199 and '206 patents, which claimed the beta polymorphic form of rifaximin.

137.    Furthermore, the latest-expiring polymorphic rifaximin patent was the '196 patent expiring on September 2, 2027, which was directed to processes for making and pharmaceutical compositions of the delta and epsilon polymorphic forms of rifaximin. Even if it was valid, the 2027 expiration date of the '196 patent could not warrant Teva waiting until 2028 to enter the market.  The same is true of the earlier-expiring '949 and '762 patents (directed to the delta and epsilon forms of rifaximin), which expire on February 27, 2026.

138.    Teva also had solid noninfringement defenses to the delta and epsilon polymorphic rifaximin patents, because the Teva product does not use the delta or epsilon forms.

139.    As for the patents directed to the HE indication, separate and apart from its invalidity and noninfringement defenses, Teva could have eliminated all of those patents as a barrier to entry by means of a section viii statement carving out the HE indications.

**B.  Bausch Entered an Anticompetitive Reverse-Payment Agreement with Teva**.

140.    Recognizing its vulnerability to generic competition, Bausch paid Teva to delay its entry into the market in order to protect its Xifaxan revenues.

141.    Over the years, sales of Xifaxan grew at a rapid pace, from $979 million in 2017, to $1.195 billion in 2018, to $1.452 billion in 2019.  As of 2024, Bausch's annual U.S. sales of Xifaxan were approximately $1.99 billion. Virtually all of those sales were of the 550 mg strength, and the majority were for treatment of IBS-D.

142.    In the first quarter of 2025, Bausch's revenue from Xifaxan grew 8%, as reported in an April 30, 2025 earnings presentation.

143.    Bausch has acknowledged to its investors that Xifaxan sales accounted for "approximately 80% of the Salix segment revenues and approximately 21% of [Bausch's overall] revenues for 2023 and 2022, respectively." In comparison, "no other single product group represented 10% or more of the company's Salix segment product sales." Bausch has cautioned since 2017 that if Xifaxan's patents could not be successfully defended, the company could face losing "a significant portion of sales in a very short period." Xifaxan 550 mg revenue was so critical that any loss of patent protection sooner than anticipated would adversely impact Bausch's future cash flows, result in shortened useful lives of Xifaxan's intangible assets, increase amortization expenses, and "materially affect company operations."

144.    On September 12, 2018, Bausch announced the settlement of the pending litigation against Teva relating to the alleged infringement of Bausch's Xifaxan 550 mg patents. Bausch and Teva settled the patent lawsuit before the Court issued a ruling on the validity and/or infringement of Bausch's patents. That settlement included large and unexplained reverse payments to Teva to delay its market entry until January 1, 2028 and, in doing so, to disincentivize and/or block other generic entrants from entering the market as well.

145.    Bausch's press release announcing the settlement stated that Teva was given the option, beginning on January 1, 2028 (or earlier if another generic Xifaxan product entered the market), to "(1) market a royalty-free generic version of XIFAXAN 550 mg tablets, should it receive approval from the U.S. Food and Drug Administration on its Abbreviated New Drug Applicant, or (2) to market an authorized generic version of XIFAXAN 550 mg tablets with drug supply being provided by Salix. In the case an authorized generic is marketed, the volume of the authorized generic will be subject to manufacturing and supply quantities until final patent expiry, and Bausch Health will receive an undisclosed share of the economics from [Teva] on its sales of an authorized generic."

146.    For decades it has been part of Teva's corporate strategy to settle Hatch-Waxman patent cases in ways that provide it "value" beyond what the statute itself provides. The principal way that it extracts this value is by insisting on contract provisions that create "exclusivities" that the statute itself does not provide.

147.    These contractual exclusivities—none of which is authorized by the Hatch-Waxman Amendments—include no-authorized-generic clauses and the deterrence clauses described above. As late as 2018, it was common for Teva to insist on such provisions as part of settling Hatch-Waxman patent litigations.

148.    For its part, Salix's parent company (then known as Valeant) had such an unsavory history of anticompetitive conduct that it was called before a Congressional Committee in 2016. Representative Cummings highlighted Salix's exploitation of a brand prescription drug called Glumetza, whose price Salix had suddenly raised by 750%.[26] He noted that Salix had "raise[d] the prices astronomically [for a] temporary period of time before other competitors enter the market." *Id*.

149.    In order to placate Congress, Valeant's then-CEO testified to the U.S. Senate on April 27, 2016, that "it was a mistake to pursue, and in hindsight I regret pursuing, transactions where a central premise was a planned increase in the prices of the medicines."[27] And he gave them the false comfort that, going forward, "[w]e expect our pricing actions to track industry norms." *Id*.

150.    Yet, at that very moment, Valeant and Salix were concealing from Congress exactly why Salix was able to take the dramatic price increases on Glumetza. Salix had paid its generic competitor to delay entry into the market.  In that case, the payment took two basic forms: (1) a no-AG clause; and (2) deterrence clauses. Salix took the price increases on Glumetza during the period of delayed generic entry that it had bought from the generic competitor in exchange for those payments.  *See In re Glumetza Antitrust Litig.*, 2021 WL 1817092 (N.D. Cal. May 6, 2021) (denying summary judgment).[28]

151.    In the wake of the Congressional investigations, in 2016, Valeant got a new CEO

---

[26] *Developments in the Prescription Drug Market: Oversight Hearing Before the House Comm. On Oversight and Government Reform*, 114 Cong., at 3, 119 (Feb. 4, 2016), *available at* https://www.govinfo.gov/ content/pkg/CHRG- 114hhrg25500/pdf/CHRG-114hhrg25500.pdf.

[27] Statement of J. Michael Pearson before the Senate Special Committee on Aging (Apr. 27, 2016), https://www.aging.senate.gov/imo/ media/doc/SCA_Pearson_4_27_16.PDF.

[28] Plaintiffs request that the Court take judicial notice of this Order.

and a new General Counsel. On July 13, 2018, Valeant changed its name to Bausch Health Companies Inc.—a public-relations maneuver to try to distance itself from its distasteful past.

152.    The new management team was keenly aware of the enormous profits that Salix gained from the reverse payments that it had made—and failed to disclose to Congress— with respect to Glumetza. And in 2018, when generic Xifaxan was poised to enter the market, Bausch and Salix were under enormous financial pressure. Bausch was in the midst of a multi-year effort to restructure its operations and to pay off debt. And Xifaxan was key to those efforts; Salix had recently made large investments in a sales force centered on Xifaxan, the company's most significant product.

153.    Bausch responded to the prospect of generic Xifaxan with the same anticompetitive strategy it had used with respect to Glumetza. Bausch paid its generic competitor to delay entry so that it could continue to reap unwarranted profits on a critical drug. Bausch provided Teva with the same type of reverse payments that it had used with respect to Glumetza, namely: (1) a no-AG agreement; (2) deterrence clauses.

154.    Bausch paid Teva to delay generic entry by effectively giving Teva a no-AG agreement—an agreement that Bausch would not sell an AG in competition with Teva during the six-month period after Teva's launch.  Since Teva was the first filer and entitled to six months of exclusivity vis-à-vis other ANDA filers, that agreement guaranteed that Teva would be the *only* generic Xifaxan 550 mg on the market during that time. The no-AG payment will allow Teva to sell its generic product at a higher price and to make twice as many sales as it would if Bausch were to market an AG in competition with Teva.  Those higher prices come out of the pockets of purchasers.

155.    The no-AG agreement between Bausch and Teva took a particular form.  Bausch

and Teva agreed that Teva had the option of either launching its own ANDA product, assuming it received FDA approval, or electing to have Bausch supply Teva with rifaximin to market and sell as the Xifaxan authorized generic, but with a limitation on the quantity it could sell under the agreement. This contractual arrangement makes it economically irrational for Bausch to market an authorized generic in competition with Teva. The quantity limit is in economic reality a thinly disguised agreement by Bausch not to market an authorized generic during Teva's 180-day exclusivity period.

156.    At the time of the settlement in 2018, Bausch and Teva could reasonably have expected annual sales of 550 mg Xifaxan to be approximately $2.2 billion in 2028. As noted, annual sales of the drug reached approximately $2 billion in 2024 and are virtually certain to reach the $2.2 billion level in 2025 or 2026. It is reasonable to conservatively assume that Bausch and Teva expected sales of $2.2 billion in 2028.

157.    If Teva elects to market its ANDA product without any volume limitation, two generic competitors will be on the market during the 180-day period—Teva with no quantity limitation on its sales, plus Bausch's own authorized generic. Approximately $1.0 billion of brand sales would be substituted to generic sales during those 180 days ($2.2 billion annual brand sales * 90% generic erosion * 0.5 years). The two generics would be priced at approximately 50% of the brand price and would split the generic unit sales equally. Teva's generic sales during the 180-day period would total $1.0 billion sales * 50% of the brand price with two generics * 50% of the generic market = $250.0 million. Bausch's authorized generic sales would be roughly the same.

158.    If Teva elects to market the AG with a volume limitation, Bausch could nominally launch a second AG, but under reasonable assumptions it would be foolish for Bausch to do so.

Given the volume limitation on Teva's sales, launching an AG would simply expand the generic market and displace higher-priced brand sales with lower-priced generic sales.

159.    Any volume limitation that is less than the expected rate of generic substitution will mean that launching an AG will result in the replacement of branded sales with generic sales at a lower price.  For example, suppose that Teva is subject to a volume limitation of 60% of the total market and that the expected generic substitution rate is 90%.  If Bausch does not launch an AG, and Teva is the only generic on the market, Teva's generic will take 60% of unit sales (the maximum it is permitted) and Bausch's brand product will take the other 40%.  If Bausch were to launch an AG, the generic substitution rate would rise to 90% and brand sales would drop to 10%, so 30% of the market would be converted from higher-priced brand sales to lower-priced authorized generic sales.  That would be profitable for Bausch only if the overall revenues generated from the sale of the AG outweigh the cannibalization of Bausch's branded sales.  And that would occur only if the amount of cannibalization is small—*i.e.*, if the volume limit is high.

160.    Using reasonable assumptions based on market studies, (a 90% generic substitution rate, a 50% price discount with two generics and an equal split of the generic sales), a wide range of volume limits would make it economically irrational for Bausch to sell its own authorized generic because doing so would simply replace sales of branded Xifaxan with sales of the authorized generic.

161.    In their September 2018 settlement agreement, Bausch and Teva set the quantity limit so as to make it economically irrational for Bausch to launch an authorized generic. In exchange, Teva agreed to delay its entry into the market far beyond the entry date justified by the strength of Bausch's patents. The economic substance of their agreement is that Bausch will not market an authorized generic during Teva's 180-day ANDA exclusivity period and, in exchange,

Teva will delay its entry into the market.

162.    Those economics work for Bausch and Teva because they restrain the competition that otherwise would have occurred between them, and they split the gains that competition would have delivered to purchasers. Bausch receives delayed and impaired generic entry, and Teva is permitted to sell during the 180-day period without competition from an authorized generic. Bausch's and Teva's gains are purchasers' losses. Bausch and Teva win; purchasers lose.

163.    As noted above, Teva could also elect to market generic rifaximin under its own approved ANDA rather than launching an AG supplied by Bausch.

164.    Given a choice between marketing its ANDA product and competing with an AG, or marketing an AG and having the only generic product on the market for six months, it will almost always be in the generic's interest to choose the latter.  This is true even if the generic's output under the AG option is limited.  Not facing competition from an AG allows the generic to take the entire generic market *and* to sell at higher prices.  Without generic competition, Teva is better off despite the quantity limit because it can sell more units at a higher price.

165.    For example, assume that the volume limit imposed on Teva is 60% of total market units and that the generic price with only one generic on the market is 85% of the brand price.  As explained above, if Teva chooses to launch its ANDA product it will make approximately $250 million in sales during its first six months on the market.  If Teva chooses to launch the AG, it will make $2.2 billion in annual sales * .5 years * 60% volume limit * 85% of the brand price with one generic = $561 million, more than twice as much. If the volume limitation is 67% and Teva chooses to launch the AG, it will make even more—$2.2 billion in annual sales * 0.5 years * 67% volume limit * 85% of the brand price = $626 million.

166.    The only economic function of the quantity limitation is to dissuade Bausch from

marketing an authorized generic during Teva's ANDA exclusivity period. This commercial reality is confirmed by nearly universal business practice when the parties to a licensing agreement are *not* manipulating the licensing terms to dissuade the brand manufacturer from marketing an AG. Under a traditional license and settlement agreement, a brand manufacturer typically does not provide the first filing generic an option to launch an AG. And in the rare cases where the brand does offer an AG arrangement to the first filing generic, the compensation to the brand typically comes in the form of a marked up supply price and/or royalty, not a volume limit, such that the brand would still be incentivized to launch its own AG in competition with the AG marketed by the first filer. For example, when the first filer for Forfivo XL launched an AG, the brand launched a competing AG the same day. Other examples include Silenor, Flector, and Zyclara.

167.    Bausch also paid Teva to delay its entry into the market by deterring other generic manufacturers from entering the market before Teva. Bausch agreed to deter those threats to Teva; in exchange, Teva agreed to delay entry until January 2028.

168.    When crafting the terms of their agreement, Bausch and Teva knew that other generic manufacturers would pose a competitive threat to each of them. In September 2018 Xifaxan 550 mg annual sales were already at the blockbuster level, and Teva was about to agree to delay unrestrained competition for more than nine years. This created the incentive and ability for other generic manufacturers to try to enter the market before Teva to get a period of *de facto* market exclusivity—*i.e.*, to be the only ANDA generic on the market.

169.    As explained above, Congress provided at least three pathways for second filers to enter the market ahead of a first filer that agreed to such a substantially delayed entry: (a) via successful litigation; (b) via a license from the brand manufacturer; and (c) via section viii

statements.

170.    Bausch agreed to contractual provisions designed to help protect Teva from the threat of subsequent filers beating Teva to the market by allowing Teva to accelerate its entry in the event that a subsequent filer entered before January 2028.  Those provisions deterred subsequent filers from trying to reach the market ahead of Teva.

171.    First, Bausch's payments to Teva included a clause that prevents second filers from entering the market ahead of Teva by winning a patent challenge against Bausch. Under the settlement, Bausch gave Teva the right to launch whenever a second filer receives an appellate court ruling affirming that all the patents entitling Teva to 180-day exclusivity are invalid and/or not infringed. The clause allows Teva to move up its entry date while also retaining its ANDA exclusivity. Without the clause, Teva would forfeit its ANDA exclusivity by failing to enter the market within 75 days of an appellate court affirming that judgment.

172.    Second, Bausch agreed to advance Teva's entry date in the event that a subsequent filer were to enter the market by any means, including the use of section viii statements.  For example, if Teva were to forfeit exclusivity by failing to obtain timely approval, another generic could obtain approval and enter the market by addressing one set of patents (*e.g.*, the HE patents) using section viii statements and winning litigation with respect to another set of patents (*e.g.*, the polymorph and IBS patents).  Again, absent this clause, Teva would be stuck on the sidelines while these more enterprising generic manufacturers entered the market long before Teva's delayed January 2028 date.

173.    Third, Bausch also agreed that if Bausch were to grant a license to any manufacturer to enter the market before Teva's delayed date of January 1, 2028, Teva's agreed entry date would be moved up to the second filer's earlier date.

174.    Thus, Bausch and Teva arranged that second filers could not get ahead of Teva—despite its agreement to a 9+ year delay—via a litigation victory against Bausch or a license from Bausch.

175.    These provisions eliminated pathways that Congress provided for second filers to enter the market ahead of first filers that have agreed with the brand manufacturer to delay entering the market with competing generic products.

176.    In exchange for the no-AG payment and these additional payments from Bausch, Teva agreed to delay entry into the market until January 1, 2028.

**C.  Bausch's Payments to Teva Were Large and Unexplained**.

177.    The payments from Bausch to Teva were large, which is why Teva agreed in 2018 to a 10-year delay of entry until January 2028.

178.    As noted above, without the no-AG payment, Teva would face competition from Bausch's authorized generic during the 180-day ANDA exclusivity period and could expect to make sales of approximately $250 million during that time. The no-AG agreement will allow Teva to capture the entire generic market at a higher price, more than doubling its revenues.

179.    As shown above, assuming a volume limit of 60% and a price with one generic on the market of 85% of the brand price, Teva could expect to make $2.2 billion in annual sales * 0.5 years * 60% volume limit * 85% price with one generic on the market = $561 million.  The size of the payment to Teva is the difference between Teva's sales with the no-AG pact ($561 million) and its sales in a competitive market ($250 million), or $311 million.  The exact volume limitation contained in the Bausch-Teva agreement has not been disclosed, and the size of the payment could be higher or lower than $311 million depending on the exact volume limitation agreed to, but the payment is under any circumstances large and unexplained.

180.    In addition to the enormous value given to Teva, the reverse payment represented an economic sacrifice by Bausch.  In a competitive market, Bausch would have earned $250 million (about equal to what Teva would have earned) by marketing its own authorized generic.

181.    Of course, the anticompetitive profits that Bausch will earn by delaying generic competition until 2028 will far outweigh that sacrifice.

182.    The size of the payment also far exceeds the litigation costs that Bausch saved by settling the patent case. Bausch saved less than $10 million in litigation costs by settling.  Thus, Bausch's agreement to forgo AG sales of $250 million cannot be explained as merely an effort to avoid litigation costs. It is instead explained as a successful effort to impair and delay generic competition.

**D.  Absent the Unlawful Agreement, Generic Xifaxan Would Have Entered the Market**.

183.    Bausch's unlawful agreement with Teva has forestalled generic entry of Xifaxan 550 mg.  Notwithstanding the size of the market and the number of generic competitors that have sought FDA approval to market a generic version of Xifaxan, there is no generic version of Xifaxan available today and it is likely that no generic version of Xifaxan will be available until January 2028.  Even when that occurs there will be only one generic version of Xifaxan on the market, the sales of that one generic will be limited and generic prices will be significantly higher than they would have been absent the unlawful payments and delay. Without the unlawful payments, Teva would have already entered the market and other competitors would have followed.

184.    Before the unlawful agreement with Teva, Bausch had concluded that generic Xifaxan 550 mg was likely to be available by 2024.  Bausch discussed the Teva deal in its 2019 annual report filed with the U.S. Securities and Exchange Commission. Bausch did not disclose

in the SEC filing the means that it used to secure the deal, but it did report the effect of the deal.

185. Before the deal with Teva, Bausch reported that generic entry was likely by 2024. Bausch wrote in its FY 2019 SEC filing:

> Effective September 12, 2018 [the date of the Teva deal], the Company changed the estimated useful life of its Xifaxan 550 mg®-related intangible assets due to the positive impact of an agreement between the Company and [Teva] resolving the intellectual property litigation regarding Xifaxan 550 mg® tablets. Under the agreement, the parties have agreed to dismiss all litigation related to Xifaxan 550 mg® tablets, and all intellectual property protecting Xifaxan 550 mg® will remain intact and enforceable. As a result, the useful life of the Xifaxan 550 mg® related intangible assets was extended from 2024 to January 1, 2028.

186. The financial markets, while unaware that Bausch obtained the late entry date by making unlawful payments to Teva, had no doubt as to the deal's enormous value to Bausch given the weakness of its patents. When valuing a brand manufacturer's stock price, analysts assess the likely outcome of generic manufacturers' challenges to the brand's patents. Settlements without reverse payments do not significantly affect stock prices, on average, indicating they usually meet traders' expectations about generic entry. In contrast, stock prices tend to increase after a settlement with reverse payments because the generic entry date has been delayed beyond traders' expectations.

187. On September 12, 2018, Bausch announced the entry date that it had paid Teva to accept. The stock market was shocked. Immediately upon Bausch's announcement, its stock price skyrocketed. The stock price rose 14% on the first day of trading after the announcement, and it remained elevated in the ensuing days.

188. From September 11, 2018 to September 12, 2018, the Teva deal added a billion dollars to Bausch's stock value, or market capitalization, and went from $7.2 billion to $8.2 billion. That deal pushed Teva's entry date much later than merited by the strength of Bausch's patents. Absent that unlawful deal, Teva in fact would have entered the market far sooner than

January 1, 2028.

189.    Bausch did not advise investors that it had paid Teva to accept the near-decade-long delay in entering the market. Instead, it falsely reported in its SEC filings that "[t]he Company will not make any financial payments or other transfers of value as part of the agreement."

190.    Absent the unlawful reverse payment, a reasonable generic company in Teva's position would have launched generic Xifaxan 550 mg much earlier than January 1, 2028, either: (i) at risk; (ii) after litigating and winning; or (iii) under a lawful license from Bausch that did not include a reverse payment. Absent the unlawful reverse payments, Teva would have begun marketing generic Xifaxan 550 mg prior to the date of this Complaint and many years sooner than the agreed January 2028 entry date.

191.    Notably, the payments that Bausch made to Teva were more than Teva could have made *even if it had litigated and won the patent case*. As described in detail above, if Teva had litigated and won, it would have made about $250 million during the 180-day ANDA exclusivity period.  Assuming a 60% volume limitation, Bausch's payments were worth $311 million more than Teva could have made by competing.

192.    Most Hatch-Waxman patent cases are settled without a reverse payment.  It is likely that, absent the unlawful payments, Bausch and Teva would have settled the patent case lawfully—*i.e.*, without a reverse payment and with an earlier entry date.

193.    Alternatively, if the parties had not settled, Teva would have won the patent case. As discussed below, another generic manufacturer—Norwich Pharmaceuticals—in fact litigated essentially the same patent case against Bausch and won. Norwich filed its ANDA much later than Teva did, so Norwich did not receive its favorable ruling until August 2022 in the District

Court, and April 2024 in the Court of Appeals. Teva would have received similar rulings much earlier.

194.    Further, the FDA approvals of other generic manufacturers have been bottlenecked behind Teva's 180-day ANDA exclusivity. Absent the unlawful reverse payments, Teva would have already launched a generic Xifaxan 550 mg, and its 180-day ANDA exclusivity would have expired. The market for Xifaxan 550 mg would have been fully genericized by now and Bausch would have had no reason to block additional entrants.  Plaintiff and other purchasers of the drug would be paying a fraction of what they currently pay to acquire rifaximin.

### E.  Additional Manufacturers Have Sought to Enter the Market and Have Been Delayed by Bausch and Teva.

195.    Even after the announcement of the Bausch-Teva settlement, numerous other generics pursued ANDAs seeking to sell generic Xifaxan. Three generic manufacturers filed Xifaxan ANDAs in 2019. Two, Sun and Sandoz, were deterred from litigating and reached settlements. However, the third, Norwich, did not settle. It litigated the patents to a trial which it largely won, confirming the weakness of the majority of Bausch's patent protection. As discussed below, however, Norwich remains bottlenecked behind by Teva due to the unlawful agreement to delay entry into 2028.

196.    In early 2019 Sun Pharmaceutical Industries Ltd. ("Sun") submitted an ANDA (No. 213042) to the FDA, seeking authorization to market a generic version of Xifaxan 200 mg.

197.    By way of a letter dated March 11, 2019, Sun notified Bausch that it had submitted its ANDA and provided a paragraph IV certification to Bausch, providing the detailed factual and legal basis supporting its position that the certain patents listed in the FDA's Orange Book for Xifaxan 200 mg are invalid, unenforceable, and/or will not be infringed by the

commercial manufacture, use, or sale of Sun's generic product.

198.    On April 24, 2019, Bausch initiated a patent lawsuit against Sun in April 2019 in the U.S. District Court for the District of Delaware asserting the '620, '199, '206, '542, '644, '781, '452, '231, '275, '196, 949, '904, '968, and '115 patents.

199.    On June 24, 2019, Sun filed its Answer, Affirmative Defenses, and Counterclaim to Bausch's complaint, asserting declaratory judgment counterclaims of non-infringement and invalidity as to each asserted patent.

200.    On July 15, 2019, Bausch filed its Answer to Sun's Counterclaims.

201.    In 2019 Sandoz Inc. ("Sandoz") submitted an ANDA with a paragraph IV certifications to the FDA seeking authorization to market a generic version of Xifaxan 550 mg.

202.    By way of a letter dated September 4, 2019, Sandoz notified Bausch that it had submitted its ANDA and provided a paragraph IV certification to Bausch, providing the detailed factual and legal basis supporting its position that certain patents listed in the FDA's Orange Book for Xifaxan 550 mg are invalid, unenforceable, and/or will not be infringed by the commercial manufacture, use, or sale of Sandoz's generic product.

203.    On September 30, 2019, Bausch began a patent lawsuit against Sandoz in the U.S. District Court for the District of New Jersey asserting the '620, '199, '206, '542, '275, '644, '781,'196, '569, '949, '904, '452, '231, and '968 patents.

204.    On December 16, 2019, Bausch filed an amended complaint, adding infringement claims relating to the '384 patent, which had issued on October 29, 2019.

205.    On January 15, 2020, Sandoz filed its Answer and Counterclaim to Bausch's Amended Complaint, asserting declaratory judgment counterclaims of non-infringement and invalidity as to each asserted patent.

206.     On February 5, 2020 Bausch answered Sandoz's counterclaims.

207.     On May 6, 2020, Bausch announced that it had entered a settlement with Sandoz pursuant to which Sandoz agreed to refrain from selling generic Xifaxan 550 mg until at least January 1, 2028 (or earlier under certain circumstances) provided it had obtained FDA approval of its ANDA by that date.

208.     Of course, at the time of this settlement, Sandoz was well aware of Teva's first-to-file status (and resulting 180-day ANDA exclusivity) and the basic terms of the Bausch-Teva agreement.

209.     In particular, Sandoz was aware of the deterrence clauses in the Bausch-Teva agreement.  As noted above, those clauses had the purpose and effect of precluding later filers, such as Sandoz, from entering the market before Teva's unlawfully delayed entry date. Those anticompetitive clauses significantly diminished Sandoz's incentives to continue litigating its patent challenges against Bausch. Absent the unlawful restraints, Sandoz would have would have had multiple paths to earlier entry, including (i) after a litigation victory, (ii) an "at risk" launch as to any patents not carved out of its ANDA pursuant to a section viii statement, or (iii) under a lawful license from Bausch.

210.     Absent the unlawful restraints in the Bausch-Teva agreement, Sandoz's generic Xifaxan 550 mg would already be on the market.

211.     While the Bausch-Sun lawsuit over Sun's 200 mg ANDA was pending, in or about August 2020, Sun submitted a paragraph IV certification to the FDA, seeking authorization to market a generic version of Xifaxan 550 mg.

212.     By way of a letter dated August 10, 2020 Sun sent Bausch a Notice of paragraph IV certification asserting that the U.S. patents listed in the FDA's Orange Book for Xifaxan 550

mg were invalid, unenforceable, and/or would not be infringed by the commercial manufacture, use, or sale of Sun's generic product.

213.    On September 22, 2020, shortly after Bausch received Sun's paragraph IV certification regarding Xifaxan 550 mg and before any lawsuit over the implicated patents was filed, Bausch and Sun entered into an agreement by which Sun agreed to refrain from selling generic Xifaxan 550 mg and 200 mg until at least January 1, 2028 (or earlier under certain circumstances) provided it had obtained FDA approval of its ANDA by that date.

214.    Of course, at the time of this settlement, Sun, like Sandoz, was well aware of Teva's first-to-file status (and resulting 180 day ANA exclusivity) and the basic terms of the Bausch-Teva agreement.

215.    In particular, Sun was aware of the deterrence clauses in the Bausch-Teva agreement. Those clauses deterred Sun from trying to enter the market before Teva's unlawfully delayed entry date. And absent the unlawful restraints in the Bausch-Teva agreement, Sun would have not settled for a January 2028 licensed entry date—the date that the unlawful restraints caused Sun to accept—but would have had multiple paths to earlier entry, including: (i) after a litigation victory, (ii) an "at risk" launch as to any patents not carved out of its ANDA pursuant to a section viii statement, or (iii) under a lawful license from Bausch.

216.    Absent the unlawful restraints in the Bausch-Teva agreement, Sun's generic Xifaxan 550 mg would already be on the market.

**F.  The Courts Have Invalidated Some of Bausch's Key Patents**.

217.    Other generic manufacturers have submitted ANDAs and have declined to settle.

218.    In December 2019, Norwich submitted ANDA No. 214369, seeking approval for both IBS-D and HE indications, and included paragraph IV certifications to a number of the

Orange Book-listed patents.

219.    On December 20, 2019, Norwich submitted ANDA No. 214370, seeking FDA approval to market generic rifaximin 200 mg.  Norwich's 200 mg ANDA (No. 214370) did not include any paragraph IV certifications.

220.    On February 14, 2020, Norwich notified Bausch that it had submitted an ANDA seeking FDA approval to market generic rifaximin 550 mg and provided paragraph IV certifications to Bausch to certain patents Bausch had listed in the Orange Book, which set forth the detailed factual and legal basis supporting its position that those patents were invalid, unenforceable, and/or would not be infringed by the commercial manufacture, use, or sale of Norwich's generic 550 mg product.

221.    On March 26, 2020, Bausch filed suit against Norwich, alleging infringement by Norwich of one or more claims of twenty-three Xifaxan patents. *Salix Pharmaceuticals, LTD. et al v. Norwich Pharmaceuticals, Inc.*, No. 20-cv-00430 (D. Del.).

222.    On November 13, 2020, Bausch filed its First Amended Complaint, adding an additional three patents alleged to be infringed by Norwich.

223.    The case against Norwich went to trial in March 2022 based on three key groups of representative patents: (i) patents claiming methods of treating IBS-D with a dosing regimen based on 1650 mg per day (or 550 mg three times a day) of rifaximin; (ii) patents claiming the beta polymorphic form of rifaximin; and (iii) patents claiming treatment methods related to hepatic encephalopathy.

224.    The U.S. District Court for the District of Delaware issued a final judgment on August 10, 2022, (the "Norwich Judgment"), finding invalid the representative patents protecting the beta polymorph rifaximin composition and the claims for the methods of using Xifaxan for

treating IBS-D based on a 1650 mg per day or three-times-a-day 550 mg dosing regimen.  It also found certain of Bausch's HE patents valid and infringed.

225.    As a result of the Norwich Judgment, Bausch effectively lost the protection of its U.S. patents against generic competition for IBS-D indications.

226.    The district court's findings apply equally to the other claims Bausch had previously asserted but later withdrew. The court found the polymorph claims invalid because the prior art taught the preparation and use of crystalline rifaximin, and that one skilled in the art had good reason to use routine techniques to characterize the crystalline rifaximin produced by the prior art which would have led to detection of the polymorph β form claimed and asserted as present in the accused product. The other polymorphic forms of rifaximin would similarly been detected by routine characterization of the crystalline rifaximin produced by the prior art and the other rifaximin polymorph patent claims differ only in minor variations of excipients, hydration levels, or pharmaceutical formulation—none of which, under the court's obviousness analysis, would have conferred patentability. Accordingly, the other polymorph patent claims likewise would have been found invalid as obvious had they been tried.

227.    Bausch appealed the Norwich Judgment to the U.S. Court of Appeals for the Federal Circuit on August 16, 2022.

228.    On April 11, 2024, the appellate court affirmed the Norwich Judgment.

229.    Although the Norwich Judgment invalidated Bausch's key polymorph and IBS-D indication patents, it also found that Bausch's representative patents protecting the use of Xifaxan 550 mg tablets for hepatic encephalopathy indications were valid and infringed by the HE indications in Norwich's ANDA.

230.    Norwich's 550 mg ANDA label included both IBS-D and HE treatment

indications, so the District Court's final judgment enjoined FDA approval of Norwich's 550 mg ANDA until the last expiring HE patent in October 2029.

231.    After the Norwich Judgment, Norwich amended its ANDA to carve out the HE indications from its label via section viii statements. Norwich then filed a motion in the District Court requesting modification of the final judgment to permit the FDA to approve Norwich's revised ANDA, which is now directed to only the IBS-D indications.

232.    On May 17, 2023, the District Court denied Norwich's motion to modify the final judgment to allow Norwich to market its 550 mg ANDA product for the IBS-D indications. The court confirmed that the FDA remains enjoined from granting final approval to Norwich's ANDA until October 2, 2029. The Court of Appeals for the Federal Circuit affirmed that decision. Accordingly, Norwich cannot yet market its generic Xifaxan 550 mg even for the IBS-D indications on which it prevailed in the patent case.

233.    Bausch and Teva's unlawful conduct has delayed the entry of Norwich's generic Xifaxan 550 mg into the market. Absent the reverse payment, Teva could have litigated its challenge to conclusion and would have won, just as Norwich did, but much earlier. Because Teva would have received a favorable district court decision well before Norwich's judgment, Norwich would have been apprised of the need to "carve out" the HE indications from its ANDA application, and it would have done so from the start.

234.    Alternatively, but for Bausch's unlawful payments to Teva, Teva would have launched by now and Bausch's incentive to keep other generics off the market would have been significantly reduced.

235.    Consequently, Norwich—like Sandoz and Sun—would have been on the market selling generic Xifaxan 500mg by now.

### G. Bausch and Teva Have Excluded Amneal from the Market.

236.    In or about February 2024 Amneal Pharmaceuticals of New York, LLC and Amneal EU, Limited (collectively "Amneal") submitted an ANDA to the FDA seeking approval to market generic Xifaxan 550 mg tablets. Amneal's ANDA included a paragraph IV certification that Bausch's listed patents were invalid, unenforceable, and/or would not be infringed by Amneal's proposed ANDA product. The only indication for which Amneal's ANDA seeks FDA approval is for the treatment of IBS-D.

237.    On February 27, 2024, Amneal sent a Notice of the paragraph IV certification to Bausch, asserting that the Amneal generic would not infringe any valid and enforceable claim of the various patents that Bausch had listed in the Orange Book as claiming Xifaxan 550 mg or a method of using it.

238.    Bausch had listed the following patents in the Orange Book as claiming Xifaxan 550 mg (the "Polymorph Patents") or a method of using it (the "IBS Patents"), among others:

Polymorph Patents:

U.S. Patent No. 8,193,196 ("the '196 patent")
U.S. Patent No. 8,518,949 ("the '949 patent")
U.S. Patent No. 8,741,904 ("the '904 patent")
U.S. Patent No. 9,271,968 ("the '968 patent")
U.S. Patent No. 10,703,763 ("the '763 patent")

IBS Patents:

U.S. Patent No. 11,779,571 ("the '571 patent")
U.S. Patent No. 11,564,912 ("the '912 patent")

239.    On or around April 5, 2024, Bausch filed a patent infringement lawsuit in the District of New Jersey against Amneal, alleging that Amneal's proposed product infringed these patents.  Bausch amended its complaint on June 4, 2024.

240.    Bausch's lawsuit against Amneal triggered an automatic 30-month stay of final

FDA approval of Amneal's ANDA. The 30-month stay is not set to expire until August 29, 2026.

241.    In listing the Polymorph Patents and the IBS-D Patents in the Orange Book, Bausch asserted that they claim Xifaxan 550 mg or a method of using it, and that Bausch could reasonably assert a claim of patent infringement against anyone who made a generic version of Xifaxan 550 mg without a license from Bausch. 21 U.S.C. § 355(b)(1)(A)(viii). The Hatch-Waxman Amendments prohibit NDA holders from submitting information on patents that do not meet these criteria. 21 U.S.C. § 355(c)(2) ("Patent information that is not the type of patent information required by subsection (b)(1)(A)(viii) shall not be submitted under this paragraph.").

242.    The FDA does not verify that submitted patents actually meet the statutory listing criteria. Instead, the FDA's role with respect to the Orange Book patent listings is purely ministerial. The NDA holder is responsible for determining whether a patent claims the drug or a method of using the drug that is the subject of the NDA and therefore should be listed in the Orange Book.

243.    Likewise, the 30-month stay on Amneal's entry into the market was *automatic*, without the FDA or any other agency or regulator first determining whether Bausch's lawsuit had any merit.  It did not.

244.    For example, the method-of-use claims that Bausch is asserting against Amneal are nearly identical to the now-invalidated claims that were at issue in the *Norwich* litigation. The only difference between the claims is that the now-invalidated claims were directed to treating IBS-D in "subject[s] 65 years of age or older," while the claims of the '571 and '912 patents are directed to treating IBS in "a female subject." See '571 patent ("A method of treating bloating associated with diarrhea-predominant irritable bowel syndrome (dIBS) in a female subject, said method comprising administering, 550 mg of rifaximin TID for 14 days to the

female subject, thereby treating bloating associated with dIBS in the female subject"); and '912 patent ("A method of treating one or more symptoms of irritable bowel syndrome (IBS) in a female subject, said method comprising administering, 550 mg of rifaximin TID for 14 days to the female subject, thereby treating one or more symptoms of IBS in the female subject").

245.    Amneal received tentative FDA approval on January 16, 2025.  The approval was tentative rather than final due to the pending 30-month stay and Teva's unexpired exclusivity. But for Bausch's and Teva's unlawful conduct, Amneal would have received final approval in January 2025 and its generic version of Xifaxan would be on the market today.

**H.  Bausch and Teva Have Excluded Zydus from the Market**.

246.    In or about August 2024, Zydus Pharmaceuticals (USA) Inc. ("Zydus") submitted an ANDA to the FDA, seeking approval for its rifaximin 550 mg tablets. Zydus's ANDA included a paragraph IV certification asserting that Bausch's listed patents were invalid, unenforceable, and/or would not be infringed by Zydus's proposed generic product. The only indication for which Zydus seeks FDA approval is for the treatment of IBS-D.

247.    On or about August 15, 2024, Zydus sent a Notice of the paragraph IV certification to Bausch, asserting that the Zydus generic would not infringe any valid and enforceable claim of the various patents that Bausch had listed in the Orange Book as claiming Xifaxan 550 mg or a method of using Xifaxan 550 mg.

248.    Bausch had listed in the Orange Book the Polymorph Patents (as defined above) and the IBS Patents (as defined above).

249.    On September 27, 2024, Bausch sued Zydus on those patents in the District of New Jersey. Bausch alleged that each of the Polymorph Patents and IBS Patents is valid and infringed.

250.    By having listed those patents in the Orange Book and suing on them, Bausch elicited an automatic 30-month stay—until March 2027—on the FDA's granting approval to Zydus's ANDA.

251.    Bausch and Zydus subsequently negotiated a settlement and license agreement and, on August 19, 2025, the Court entered a stipulation dismissing Bausch's patent infringement claims.

252.    Zydus is bottlenecked by Teva's unexpired exclusivity.

**I.    Bausch and Teva Have Excluded Cipla and Carnegie from the Market**.

253.    In or about August 2024, Cipla USA, Inc., and Cipla Limited (collectively "Cipla"), submitted an ANDA (No. 219570) to the FDA, seeking FDA approval for its rifaximin 550 mg tablets.

254.    Cipla's ANDA includes a paragraph IV certification that Bausch's relevant patents are invalid, unenforceable, and/or would not be infringed by Cipla's proposed generic product. Cipla's ANDA seeks FDA approval for the treatment of IBS-D.

255.    On or about September 18, 2024, Cipla sent a notice letter and detailed statement as to of its paragraph IV certification to Bausch, asserting that the Cipla generic would not infringe any valid and enforceable claim of the various patents that Bausch had listed in the Orange Book as claiming Xifaxan 550 mg or a method of using it.

256.    On November 1, 2024, Bausch filed a patent infringement lawsuit against Cipla under the Hatch-Waxman Amendments, in the United States District Court for the District of New Jersey alleging that Cipla's ANDA product would infringe the '571, '912, '384, '196, '949, '904, '968, and '763 patents.

257.    Cipla is blocked from the market by Teva's unexpired exclusivity and the 30-

month stay triggered by Bausch's patent lawsuit. But for Bausch's unlawful payments to Teva, neither obstacle would exist. Absent Bausch's and Teva's unlawful conduct, Cipla's ANDA would be approved earlier and Cipla would then immediately enter the market.

258.    In or about September 2024 Carnegie Pharmaceuticals LLC and Carnegie Pharma Limited (collectively "Carnegie"), submitted an ANDA (No. 219892) to the FDA, seeking FDA approval for its rifaximin 550 mg tablets.

259.    Carnegie's ANDA includes a paragraph IV certification that Bausch's relevant patents are invalid, unenforceable, and/or would not be infringed by Carnegie's proposed generic product. Carnegie's ANDA seeks FDA approval for the treatment of IBS-D.

260.    On or about October 1, 2024, Carnegie sent a notice letter and detailed statement as to its paragraph IV certification to Bausch, asserting that the Carnegie ANDA Product would not infringe any valid and enforceable claim of the various patents that Bausch had listed in the Orange Book as claiming Xifaxan 550 mg or a method of using it.

261.    On November 7, 2024, Bausch filed a patent infringement lawsuit against Carnegie in the United States District Court for the District of New Jersey alleging that Carnegie ANDA product would infringe the '571, '912, '384, '196, '949, '904, '968, and '763 patents.

262.    Bausch and Carnegie subsequently entered into a settlement and license agreement and, on June 23, 2025, the Court entered a stipulation dismissing Bausch's patent infringement claims.

263.    Carnegie is blocked from the market by Teva's unexpired exclusivity. Absent Bausch's and Teva's unlawful conduct, Carnegie's ANDA would be approved earlier and Carnegie would then immediately enter the market.

**J.  Bausch and Teva Have Excluded Saba from the Market**.

264.    In February 2025, Saba Ilac Sanayi ve Ticaret A.S. ("Saba") submitted an ANDA to the FDA seeking approval to market its rifaximin 550 mg product in the United States.

265.    Saba's ANDA includes a paragraph IV certification that Bausch's relevant patents are invalid, unenforceable and would not be infringed by Saba's generic rifaximin product. Saba's ANDA seeks FDA approval for the treatment of IBS-D.

266.    On or about February 20, 2025, Saba sent a notice letter and detailed statement asserting that the Saba product would not infringe any valid and enforceable claim of the various patents that Bausch listed in the Orange Book as claiming Xifaxan 550 mg or a method of using it, specifically including the '571, '912, '196 and '115 patents.

267.    On April 4, 2025, Bausch filed a patent infringement lawsuit against Saba under the Hatch-Waxman Amendments in the District of New Jersey alleging that Saba's ANDA product would infringe the '571, '912, '196 and '115 patents.

268.    Bausch and Saba subsequently negotiated a settlement and license agreement and, on August 21, 2025, the parties filed a stipulation of dismissal as to Bausch's patent infringement claims.

269.    Saba's ANDA remains bottlenecked behind Teva.

**K.  Bausch and Teva Have Excluded Alkem from the Market**.

270.    In or about April 2025, Alkem Laboratories Ltd. ("Alkem") submitted an ANDA to the FDA seeking approval to market its rifaximin 550 mg tablet product.

271.    Alkem's ANDA includes a paragraph IV certification that Bausch's relevant patents are invalid, unenforceable and would not be infringed by Alkem's generic product. Alkem's ANDA seeks approval for the treatment of IBS-D.

272. On or about April 28, 2025, Alkem sent a notice letter and detailed statement asserting that Alkem's generic product would not infringe any valid and enforceable claim of the various patents that Bausch had listed in the Orange Book as claiming Xifaxan 550 mg or a method of using it, specifically including the '571, '912 and '196 patents.

273. On June 10, 2025, Bausch filed a patent infringement lawsuit against Alkem under the Hatch-Waxman Amendments in the District of New Jersey alleging that Alkem's product would infringe the '571, '912 and '196 patents.

274. Bausch and Alkem subsequently a settlement and license agreement and, on August 14, 2025, the parties filed a stipulation of dismissal as to Bausch's patent infringement claims.

275. Alkem's ANDA remains bottlenecked behind Teva.

## VI.    CLASS ALLEGATIONS

276. Plaintiff brings this action as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of itself and as a representative of a class defined as follows:

> All persons and entities in the United States and its territories that purchased branded Xifaxan, and/or authorized generic Xifaxan, and/or generic Xifaxan, in any form directly from the Defendants, their affiliates, or any generic manufacturer at any time during the period January 1, 2021 until the effects of Defendants' challenged conduct cease.

277. Excluded from the class are Bausch, Salix, Teva, and any of their officers, directors, management, employees, parents, subsidiaries, and affiliates.

278. Also excluded from the class are the government of the United States and all agencies thereof, and all state and local governments and all agencies thereof.

279.    Members of the class are so numerous and geographically dispersed that joinder of all members is impracticable. Plaintiff believes that the class is numerous and widely dispersed throughout the United States. Given the costs of complex antitrust litigation, it would be uneconomic for many plaintiffs to bring individual claims and join them together. The class is readily identifiable from information and records in the Defendants' possession.

280.    Plaintiff's claims are typical of the claims of the members of the class. Plaintiff and all members of the direct purchaser class were damaged by the same wrongful conduct of the Defendants—i.e., as a result of the Defendants' conduct, they paid artificially inflated prices for Xifaxan or generic Xifaxan.

281.    Plaintiff will fairly and adequately protect and represent the interests of the class. The interests of the Plaintiff are coincident with, and not antagonistic to, those of the other members of the class.

282.    Counsel who represent the Plaintiff are experienced in the prosecution of antitrust class action litigation and have particular experience with antitrust class action litigations involving pharmaceutical products.

283.    Questions of law and fact common to the members of the class predominate over questions that may affect only individual class members, because the Defendants have acted on grounds generally applicable to the entire class, thereby making overcharge damages with respect to the class as a whole appropriate. Such generally applicable conduct is inherent in the Defendants' wrongful conduct.

284.    Questions of law and fact common to the class include:

    a.    Whether the Defendants unlawfully maintained monopoly power through all or part of their overall anticompetitive generic suppression scheme;

b.   Whether there exist any legitimate procompetitive reasons for some or all of the Defendants' conduct;

c.   To the extent such justifications exist, whether there were less restrictive means of achieving them;

d.   Whether direct proof of the Defendants' monopoly power is available and, if so, whether it is sufficient to prove the Defendants' monopoly power without the need to define the relevant market;

e.   Whether the Defendants' scheme, in whole or in part, has substantially affected interstate commerce;

f.   Whether the Defendants' unlawful agreement, in whole or in part, caused antitrust injury through overcharges to the business or property of Plaintiff and the members of the class;

g.   Whether the Defendants conspired to delay generic competition for Xifaxan;

h.   Whether Bausch and Teva entered into an unlawful agreement in restraint of trade;

i.   Whether the Defendants' Agreement was a reverse payment agreement;

j.   Whether Teva agreed to delay entry into the market with a generic version of Xifaxan pursuant to an agreement in restraint of trade;

k.   Whether Bausch paid Teva to delay entry into the market with a generic version of Xifaxan pursuant to an agreement in restraint of trade;

l.   Whether the September 2018 Bausch-Teva Settlement was unlawful under the rule of reason;

m.   Whether Bausch's agreement with Teva was necessary to yield some cognizable, non-pretextual procompetitive benefit;

n.   Whether Bausch's compensation to Teva was large and unexplained;

o.   Whether the reverse payment harmed competition;

p.   Whether Bausch possessed market power or monopoly power in the relevant market(s);

q.   Whether the Defendants' unlawful conduct was a substantial contributing factor in causing some amount of delay of the entry of AB-rated generic

Xifaxan or in causing some amount of delay in the market entry of multiple competing AB-rated generic Xifaxan products;

r.    Determination of a reasonable estimate of the amount of delay the Defendants' unlawful monopolistic conduct caused;

s.    Whether the Defendants' conduct caused antitrust injury in the form of overcharges to Plaintiff and class members; and

t.    The quantum of overcharges paid by the class in the aggregate.

285.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

286.    Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

### VII.    MARKET POWER AND RELEVANT MARKET

287.    The pharmaceutical marketplace is characterized by a "disconnect" between product selection and the payment obligation. State laws prohibit pharmacists from dispensing many pharmaceutical products, including Xifaxan, to patients without a prescription. The prohibition on dispensing certain products without a prescription creates this disconnect. The patient's doctor chooses which product the patient will buy, while the patient (and in most cases his or her insurer) has the obligation to pay for the product.

288.    Brand manufacturers, including Bausch, exploit this price disconnect by employing large sales forces that visit doctors' offices and persuade them to prescribe the brand

manufacturers' products. These sales representatives do not advise doctors of the cost of the branded products. Studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are largely insensitive to price differences because they do not pay for the products. The result is a marketplace in which price plays a comparatively unimportant role in product selection.

289.    The relative unimportance of price in the pharmaceutical marketplace reduces what economists call the cross-price elasticity of demand—the extent to which rising prices of a product cause unit sales to decline because of substitution to other products. This reduced cross-price elasticity, in turn, gives brand manufacturers the ability to raise price substantially above marginal cost without losing so many sales as to make the price increase unprofitable. The ability to profitably raise prices substantially above marginal costs is what economists and antitrust courts refer to as market power. The result of these pharmaceutical market imperfections and marketing practices is that brand manufacturers gain and maintain market power with respect to many branded prescription pharmaceuticals, including Xifaxan.

290.    At all relevant times, Bausch has had monopoly power in the market for Xifaxan because it had the power to exclude competition and/or raise or maintain the prices at supra-competitive levels without losing enough sales to make supra-competitive prices unprofitable.

291.    At all relevant times, a small but significant, non-transitory increase to the price of brand Xifaxan would not have caused a significant loss of sales.

292.    Xifaxan does not exhibit significant, positive cross-elasticity of demand with respect to price with any other drug other than AB-rated generic versions of Xifaxan.

293.    Bausch needed to control only brand Xifaxan and its AB-rated generic equivalents, and no other products, in order to maintain the price of rifaximin profitably at supra-

competitive prices. Only the market entry of competing, AB-rated generic versions of Xifaxan would render Bausch unable to profitably maintain prices for Xifaxan without losing substantial sales.

294.    Bausch sold brand Xifaxan at prices well in excess of marginal costs and in excess of the competitive price, and therefore, Bausch had high profit margins.

295.    Bausch had and exercised the power to exclude generic competition to brand Xifaxan.

296.    At all material times, high barriers to entry, including regulatory protections and high costs of entry and expansion, protected brand Xifaxan from the forces of price competition.

297.    There is direct evidence of Bausch's monopoly power and anticompetitive effects available in this case sufficient to show the Bausch's ability to control the price of Xifaxan, and to exclude relevant competitors, without the need to show the relevant antitrust markets. The direct evidence consists of, inter alia, the following facts: (i) the ratio of the price of Xifaxan to its marginal cost; (ii) the margins earned by Bausch on the sale of Xifaxan; and (iii) the size and existence of the reverse payment from Bausch to Teva. As the Supreme Court recognized in *Actavis*, firms lacking market power are not likely to pay a competitor a large sum to avoid the risk of competition. 570 U.S. at 157.

298.    To the extent proof of monopoly power by defining a relevant product market is required, Plaintiff alleges that the relevant antitrust market is the market for Xifaxan and its AB-rated generic equivalents.

299.    The United States, the District of Columbia, and the U.S. territories constitute the relevant geographic market.

300.    Bausch's share of the relevant market has been 100% since the launch of Xifaxan.

## VIII.   MARKET EFFECTS AND DAMAGES TO THE CLASS

301.     The Defendants willfully and unlawfully maintained Bausch's market power by engaging in an overarching scheme to exclude competition. The Defendants designed a scheme to delay entry of generic competitors, to further Bausch's anticompetitive purpose of forestalling generic competition against Xifaxan. The Defendants carried out the scheme with the anticompetitive effect of maintaining supra-competitive prices for the relevant product.

302.     The Defendants implemented the scheme as described herein. These acts, in combination and individually, were undertaken to serve the Defendants' anticompetitive goals.

303.     The Defendants' acts and practices had the purpose and effect of restraining competition unreasonably and injuring competition by protecting brand Xifaxan from competition. These actions allowed the Defendants to maintain a monopoly and exclude competition in the market for brand Xifaxan and its generic equivalent, to the detriment of the Plaintiff and all other members of the direct purchaser class.

304.     The Defendants' exclusionary conduct has delayed generic competition and unlawfully enabled Bausch to sell brand Xifaxan without generic competition. Were it not for the Defendants' illegal conduct, one or more generic versions of Xifaxan would have entered the market.

305.     As a consequence, the Plaintiff and other members of the class have sustained substantial losses and damage to their business and property in the form of overcharges, the exact amount of which will be the subject of proof at trial.

## IX.   ANTITRUST IMPACT AND EFFECT ON INTERSTSATE COMMERCE

306.     During the relevant time period, Bausch manufactured, sold, and shipped Xifaxan across state lines in an uninterrupted flow of interstate commerce.

307.     During the relevant time period, the Plaintiff, by assignment from McKesson, and members of the class purchased substantial amounts of Xifaxan directly from Bausch. As a result of the Defendants' illegal conduct, the Plaintiff and the members of the class were compelled to pay, and did pay, artificially inflated prices for Xifaxan.

308.     During the relevant time period, the Defendants used various devices to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and/or interstate and foreign wire commerce.

309.     The Defendants' conduct was within the flow of, and was intended to have and did have a substantial effect on, interstate commerce in the United States, including in this District.

310.     During the class period, each Defendant, or one or more of each Defendant's affiliates, used the instrumentalities of interstate commerce to join or effectuate the scheme. The scheme in which the Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## X.     CLAIMS FOR RELIEF

### COUNT ONE – VIOLATION OF 15 U.S.C. § 1 (AGAINST ALL DEFENDANTS)

311.     Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

312.     Bausch has possessed monopoly power in the relevant market from the launch of Xifaxan through the present.

313.     Defendants violated 15 U.S.C. § 1 of the Sherman Act by entering into an agreement in unreasonable restraint of trade in executing and adhering to an agreement containing an unlawful reverse payment by Bausch. In or about September 2018, Bausch and

Teva entered into an unlawful reverse-payment agreement whereby Bausch made large and unjustified payments to Teva in exchange for Teva's agreement to delay the sale of generic Xifaxan until January 1, 2028. Bausch's payment included an effective agreement by Bausch not to launch an authorized generic to compete with Teva's ANDA product and provisions that effectively deterred subsequent filers from beating Teva to the market. The purpose and effect of the agreement were: (1) to delay the entry of generic Xifaxan and allow Bausch to maintain and extend its monopoly in the relevant market until January 2028, to the detriment of Plaintiff and members of the direct purchaser class; and (2) to induce Teva to accept a later entry date by effectively granting Teva a monopoly over the sale of generic Xifaxan for at least six months after January 2028, also to the detriment of Plaintiff and members of the direct purchaser class.

314.    Defendants' unlawful agreement has had a substantially adverse effect on competition within the relevant market.

315.    There is and was no legitimate, non-pretextual, procompetitive business justification for this reverse payment agreement that outweighs its harmful effect on direct purchasers and competition. Even if there was some conceivable and cognizable justification, the payment was not necessary to achieve such as purpose.

316.    In the alternative, the agreement between Bausch and Teva was an illegal temporal horizontal market-allocation agreement, a per se violation of section one of the Sherman Act. Teva agreed not to compete with Bausch from 2018 until January 1, 2028, and Bausch agreed not to compete with Teva from January 1, 2028, until six months after Teva's entry.

317.    As a result of Defendants' illegal conduct, Plaintiff and members of the direct purchaser class have been compelled to pay, and continue to pay, inflated prices for Xifaxan.

Plaintiff and members of the direct purchaser class will also pay inflated prices for generic Xifaxan when it becomes available.

318.    Plaintiff and members of the direct purchaser class have been injured in their business or property by Defendants' antitrust violations. The injury consists of paying higher prices for brand Xifaxan, and for generic Xifaxan when it is available, than would have been paid in the absence of Defendants' antitrust violations. Such injury, called "overcharges," is of the type that the antitrust laws were designed to prevent, and it flows from that which makes the Defendants' conduct unlawful.

319.    As a direct and proximate result of Defendants' anticompetitive conduct, including the reverse payment, Plaintiff and members of the proposed direct purchaser class have been injured by this conduct, and seek treble damages.

### COUNT TWO – VIOLATION OF 15 U.S.C. § 2 (MONOPOLIZATION) (AGAINST BAUSCH)

320.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

321.    Bausch has possessed monopoly power in the relevant market from the launch of Xifaxan through the present.

322.    Bausch has unlawfully maintained its monopoly power by entering into a reverse-payment agreement that included large and unjustified payments to Teva in exchange for Teva's agreement to delay the sale of generic Xifaxan until January 1, 2028. Bausch's payments will allow Teva to enjoy a monopoly power over generic Xifaxan for at least six months after January 1, 2028 and to charge Plaintiff and members of the direct purchaser class monopoly prices during that period.

323.    The goal, purpose, and effect of Bausch's unlawful conduct was to maintain and extend its monopoly power in the relevant market. The delay in the introduction of generic Xifaxan that Bausch purchased allowed it to continue charging supracompetitive prices for the drug and earning supracompetitive profits. Because the payment to Teva included the grant of a monopoly on sales of generic Xifaxan, Teva will be able to maintain supracompetitive prices on generic Xifaxan even after its belated entry into the market in January 2028, creating further harm to the market and to Plaintiff and members of the direct purchaser class.

324.    As a result of Bausch's illegal conduct, Plaintiff and members of the direct purchaser class have been compelled to pay, and continue to pay, inflated prices for Xifaxan. Plaintiff and members of the direct purchaser class will also pay inflated prices for generic Xifaxan when it becomes available.

325.    The anticompetitive consequences of Bausch's actions far outweigh any arguable procompetitive benefits.

326.    Plaintiff and members of the direct purchaser class have been injured in their business or property by Bausch's antitrust violations. The injury consists of paying higher prices for brand Xifaxan, and for generic Xifaxan when it is available, than would have been paid in the absence of Bausch's antitrust violations. This injury is of the type that the antitrust laws were designed to prevent and flows from that which makes Bausch's conduct unlawful.

327.    Bausch's anticompetitive conduct was, in the aggregate, an act of monopolization undertaken with the specific intent to monopolize the market for Xifaxan in the United States, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

328.    Plaintiff and members of the proposed direct purchaser class have been injured by this conduct and seek treble damages for past harms.

## DEMAND FOR JUDGMENT

WHEREFORE, the Plaintiff, on behalf of itself and the proposed class, respectfully demands that this Court:

A.      Determine that this action may be maintained as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the class, and declare the Plaintiff as representative of the class;

B.      Enter joint and several judgments against the defendants and in favor of the Plaintiff and the class;

C.      Award the class damages (i.e., three times overcharges) in an amount to be determined at trial;

D.      Award permanent injunctive relief prohibiting Defendants from continuing their unlawful conduct and requiring them to take affirmative steps to remedy the continuing adverse effects of their prior conduct;

E.      Award the Plaintiff and the class their costs of suit, including reasonable attorneys' fees as provided by law; and

F.      Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff, on behalf of itself and the proposed class, demands a trial by jury on all issues so triable.

Dated: October 21, 2025

Respectfully submitted,

/s/ *Brooks R. Magratten*
Brooks R. Magratten (#3585)
Stanley F. Pupecki (#6704)
**PIERCE ATWOOD LLP**
One Citizens Plaza, 10th Floor
Providence, Rhode Island 02903
Telephone: (401) 490-3422
bmagratten@pierceatwood.com
spupecki@pierceatwood.com

Michael L. Roberts (*pro hac vice forthcoming*)
Sarah E. DeLoach (*pro hac vice forthcoming*)
Erich P. Schork (*pro hac vice forthcoming*)
Stephanie E. Smith (*pro hac vice forthcoming*)
Joshua Zuckerman (*pro hac vice forthcoming*)
**ROBERTS LAW FIRM US, PC**
1920 McKinney Ave., Suite 700
Dallas, TX 75201
Telephone: (501) 821-5575
mikeroberts@robertslawfirm.us
sarahdeloach@robertslawfirm.us
erichschork@robertslawfirm.us
stephaniesmith@robertslawfirm.us
joshzuckerman@robertslawfirm.us

Dianne M. Nast (*pro hac vice forthcoming*)
Joseph N. Roda (*pro hac vice* forthcoming)
**NASTLAW LLC**
1101 Market Street, Suite 2801
Philadelphia, PA 19107
Telephone: (215) 923-9300
Facsimile: (215) 923-9302
dnast@nastlaw.com
jnroda@nastlaw.com

Linda P. Nussbaum (*pro hac vice* forthcoming)
**NUSSBAUM LAW GROUP, P.C.**
1133 Avenue of the Americas, 31st Floor
New York, NY 10036
Telephone: (917) 438-9102
lnussbaum@nussbaumpc.com

*Counsel for KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc. and the Proposed Direct Purchaser Class*